570 A.2d 903

MARY ANN GRIGOLETTI AND PHYLLIS IMPELLIZERI, PLAIN-
TIFFS–RESPONDENTS, v. ORTHO PHARMACEUTICAL COR-
PORATION, DAVID WILLIAMS, AND HUGH CONNOR, DE-
FENDANTS–APPELLANTS.

Argued September 11, 1989—Decided March 5, 1990.

90

*James E. Farrell, Jr.,* argued the cause for appellants (*Russell C. Deyo,* attorney; *Maxine H. Neuhauser* and *Beverly A. Williams,* on the briefs).

*P. Kay McGahen* argued the cause for respondents (*P. Kay McGahen,* attorney; *Ellen M. Casey,* on the brief).

*Lynn B. Norcia,* Deputy Attorney General, argued the cause for *amicus curiae,* Division on Civil Rights (*Peter N. Perretti, Jr.,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

HANDLER, J.

This case, brought under the New Jersey Law Against Discrimination, requires the Court to determine whether plaintiffs,

two females who were employed by defendants and who were paid less than male employees performing comparable work suffered unlawful gender discrimination. Plaintiffs filed their complaints in the Superior Court, Law Division. The trial court found in favor of defendants and determined that such gender bias had not been established. The Appellate Division, in a reported decision, 226 *N.J.Super.* 518, 545 *A.*2d 185 (1988), reversed and entered judgment in favor of plaintiffs. We granted defendants' petition for certification. 113 *N.J.* 640, 552 *A.*2d 165 (1988). Resolution of the major issue posed by this appeal requires an explication of the substantive and procedural standards that should govern gender-discrimination claims based on unequal pay for comparable work.

I.

Plaintiffs, Mary Ann Grigoletti and Phyllis Impellizeri, were both employed by the defendant Ortho Pharmaceutical Corp. ("Ortho"). Grigoletti worked at Ortho from 1977 until 1985; during this time she received four promotions and corresponding pay increases. Most of her work was done in the area of purchasing. She possessed a high-school-equivalency diploma and had attained some college credits. When she left in 1985, her salary was $32,000.

Impellizeri started with Ortho as an executive secretary in 1972. During her career at Ortho she was promoted several times. At the urging of a supervisor at Ortho, she began college studies in the Rutgers evening program and received a B.A. degree in 1982. When she resigned from Ortho in December 1984, her salary was $38,300 as well as an executive bonus and stock awards.

In early 1983, Ortho decided to implement an "all-inclusive" computerized system encompassing every facet of its manufacturing operation, referred to as the Manufacturing Resource Planning Program or Manufacturing Resources Program ("MRP"). Ortho developed an MRP Project Team ("Team")

consisting of four employees and one leader. Defendant Hugh Connor served as the Team leader and was responsible for supervising the Team members and reporting to Ortho's Steering Committee, which included defendant David Williams. The Team originally consisted of the two plaintiffs as well as Ed Struzik and Alexis Jordan. After plaintiffs left Ortho, Michael Esposito was placed on the Team as a module leader. Each Team member was chosen because he or she had proven to be effective in a different area of corporate activity and each was given the title "MRP Project Manager." However, the assignment to the Team was considered a lateral move. The members' salaries were all "frozen" at their prior job levels for the duration of the project.[1] The members were committed to the project for two years.

Interpersonal problems plagued the project from the outset. In late 1983 and early 1984, plaintiffs complained to Williams about Connor's management style. Those complaints focused on Connor's obstinate demeanor and his favoritism of Jordan, as well as his continual highly personal criticisms of Grigoletti. Shortly after these discussions with Williams, Ortho brought in an outside consultant to conduct an investigation. The problems were not ameliorated, and Ortho retained another consulting firm to examine the situation. The difficulties persisted. In May 1984 Impellizeri drafted a report for Williams, enumerating the many problems she believed were affecting the project. After Impellizeri submitted this report, Ortho again

---

[1]The work histories and salaries (apart from other kinds of compensation) of the persons assigned to the project were as follows:

| NAME | GENDER | LEVEL | HIRED | EDUCATION | SALARY |
| --- | --- | --- | --- | --- | --- |
| Alexis Jordan | F | 15 | 11/81 | MBA 1977 | $47,200 |
| Michael Esposito | M | 14 | 11/83 | HS+ | $44,500 |
| Ed Struzik | M | 14 | 11/75 | BA 1973 | $41,600 |
| Phyllis Impellizeri | F | 15 | 8/72 | BA 1982 | $38,300 |
| Mary Ann Grigoletti | F | 13 | 8/77 | HS+ | $32,000 |

engaged the consulting firm. In June 1984, Ortho removed Connor from the Team and replaced him with Elizabeth Robinson, who held the position until the Team completed the project in December 1985.

In December 1984, after Impellizeri had already completed her module implementation, Robinson and Williams joined in a decision to remove Impellizeri from the project. Impellizeri received a performance evaluation of average with no potential and was transferred to the position of contract buyer in purchasing, a position she had held five years earlier. Shortly thereafter, she resigned. In February 1985, prompted by Impellizeri's demotion, Grigoletti decided to leave Ortho.

In April 1986,[2] plaintiffs filed separate complaints against the defendants charging unlawful discrimination under the New Jersey Law Against Discrimination ("LAD"), *N.J.S.A.* 10:5-12, and wrongful discharge. Grigoletti alleged that the fact that male employees in "equal positions" with "equal responsibilities" earned higher salaries constituted gender discrimination in violation of the LAD; she also asserted that she was sexually harassed, that Ortho's refusal to fairly compensate her and to remedy sexual harassment was a breach of an employment contract embodied in the Company personnel manual, that Ortho breached her employment contract by not paying her overtime, and that she was constructively discharged. Impellizeri contended that the lack of a reasonable merit increase violated the employment contract embodied in personnel manuals distributed to employees; that defendants took retaliatory action against her, in violation of the LAD, for objecting to the harassment of Grigoletti; that retaliatory action in the form of a poor performance rating was a breach of contract; and that she was the victim of age discrimination in violation of the LAD.

---

[2]The Appellate Division mistakenly recited, 226 *N.J.Super.* at 521, 545 *A.2d* 185, that the complaints were filed in April 1985.

The Law Division consolidated the actions, and defendants filed an answer denying the allegations and moving for summary judgment on all issues. Impellizeri moved to amend her complaint to assert a wage-based sex-discrimination claim similar to that alleged by Grigoletti. The court denied the motion. The court then granted defendants' summary judgment motion on the wrongful-discharge claims as well as on Impellizeri's age-discrimination claim. Following a trial on the remaining counts involving gender discrimination, the court found against plaintiffs, reasoning that although the MRP team members performed essentially the same tasks for two years, there was no unlawful discrimination.

The Appellate Division disagreed with the trial court, ruling that the evidence demonstrated gender discrimination based on the payment of unequal salaries to plaintiffs for work that was substantially equal to that performed by others on the team. It ruled that there should be a remand to enable plaintiffs to prove damages and that plaintiffs were entitled to attempt to prove their claims relating to wrongful discharge.

## II.

The principal issue raised by this case is whether plaintiffs suffered unlawful discrimination when they received lower wages than male employees performing comparable work. We have before emphasized that discrimination based on gender "is peculiarly repugnant in a society which prides itself on judging each individual by his or her merits." *Peper v. Princeton Univ.*, 77 *N.J.* 55, 80, 389 *A.*2d 465 (1978). We have also stressed in the context of gender-employment discrimination the principle that "the overarching goal of the [LAD] is nothing less than the eradication 'of the cancer of discrimination.' " *Fuchilla v. Layman*, 109 *N.J.* 319, 334, 537 *A.*2d 652 (1988) (quoting *Jackson v. Concord Ins. Co.*, 54 *N.J.* 113, 124, 253 *A.*2d 793 (1969)); *see Erickson v. Marsh & McLennon*, 117 *N.J.* 539, 569 *A.*2d 793 (1990). Determination of the validity of

claims of wage-discrimination based on gender, as posed by this appeal, invokes not only these concerns, but requires a fresh examination of the substantive and procedural standards that ordinarily govern the resolution of discrimination claims under the LAD.

In a variety of contexts involving allegations of unlawful discrimination, this Court has looked to federal law as a key source of interpretive authority. The substantive and procedural standards that we have developed under the State's LAD have been markedly influenced by the federal experience. In outlining approaches and infusing discrimination claims under the LAD with substantive content, we have adopted the Supreme Court's analysis of unlawful discrimination claims brought under Title VII of the Civil Rights Act of 1964, 42 *U.S.C.* § 2000e-2 ("Title VII"), most cogently presented in *McDonnell Douglas Corp. v. Green*, 411 *U.S.* 792, 93 *S.Ct.* 1817, 36 *L.Ed.*2d 668 (1973). *See, e.g., Erickson v. Marsh & McLennan, supra*, 117 *N.J.* at 551, 569 *A.*2d 793 (applying Title VII analysis to LAD claim charging gender discrimination in failure to promote); *Goodman v. London Metals Exch.*, 86 *N.J.* 19, 31, 429 *A.*2d 341 (1981) (applying Title VII analysis to LAD claim alleging sex discrimination in refusing to hire plaintiff); *Peper v. Princeton Univ., supra*, 77 *N.J.* at 82–83, 389 *A.*2d 465 (applying Title VII analysis to LAD claim alleging sex discrimination in discharging plaintiff); *see also Shaner v. Horizon Bancorp.*, 116 *N.J.* 433, 437, 561 *A.*2d 1130 (1989) (approving of the use of "federal anti-discrimination statutes" in general, and Title VII in particular, when interpreting the LAD in an age-discrimination case); *Clowes v. Terminex Int'l*, 109 *N.J.* 575, 595–96, 538 *A.*2d 794 (1988) (applying Title VII to LAD claim alleging discriminatory termination of plaintiff because of alcoholism, a physical handicap); *Andersen v. Exxon Co.*, 89 *N.J.* 483, 446 *A.*2d 486 (1982) (applying Title VII to LAD claim alleging failure to hire a physically handicapped plaintiff). The Supreme Court itself has also followed *McDonnell Douglas* in subsequent cases. *See, e.g., Watson v. Fort Worth Bank*

*and Trust,* 487 *U.S.* 977, 108 *S.Ct.* 2777, 101 *L.Ed.*2d 827 (1988); *Texas Dep't of Community Affairs v. Burdine,* 450 *U.S.* 248, 101 *S.Ct.* 1089, 67 *L.Ed.*2d 207 (1981); *Dothard v. Rawlinson,* 433 *U.S.* 321, 97 *S.Ct.* 2720, 53 *L.Ed.*2d 786 (1977).

We explained our understanding of the *McDonnell Douglas* test in *Andersen v. Exxon Co., supra:*

> [t]he *McDonnell Douglas* approach established the elements of a *prima facie* case of unlawful discrimination. The plaintiff must demonstrate by a preponderance of the evidence that he or she (1) belongs to a protected class, (2) applied and was qualified for a position for which the employer was seeking applicants, (3) was rejected despite adequate qualifications, and (4) after rejection the position remained open and the employer continued to seek applications for persons of plaintiff's qualifications. Establishment of the *prima facie* case gives rise to a presumption that the employer unlawfully discriminated against the applicant. The burden of going forward then shifts to the employer to rebut the presumption of undue discrimination by articulating some legitimate, nondiscriminatory reason for the employee's rejection. The plaintiff then has the opportunity to prove by a preponderance of the evidence that the legitimate nondiscriminatory reason articulated by the defendant was not the true reason for the employment decision but was merely a pretext for discrimination. In such cases the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff; only the burden of going forward shifts.
>
> [89 *N.J.* at 492, 446 *A.*2d 486 (citations omitted).]

However, the Court has never embraced the *McDonnell Douglas* test literally, invariably, or inflexibly. We have recognized that the *McDonnell Douglas* criteria "provide only a general framework for analyzing unlawful discrimination claims and must be modified where appropriate." *Erickson v. Marsh & McLennan, supra,* 117 *N.J.* at 550, 569 *A.*2d 793; *see also Dixon v. Rutgers,* 110 *N.J.* 432, 442, 541 *A.*2d 1046 (1988) (Title VII standards "can be applied where 'useful and fair' to the state law context in determining whether an unlawful discriminatory purpose is present." (quoting *Peper, supra,* 77 *N.J.* at 81, 389 *A.*2d 465)); *Clowes v. Terminex Int'l, supra,* 109 *N.J.* at 595, 538 *A.*2d 794 (*McDonnell Douglas* test is usually invoked—at least as " 'as a starting point' for analysis in actions brought under the [LAD]." (quoting *Andersen v. Exxon, supra,* 89 *N.J.* at 492, 446 *A.*2d 486)); *Peper v. Princeton Univ., supra,* 77 *N.J.* at 83, 389 *A.*2d 465 (the *McDonnell*

*Douglas* "tests are to be used only where and to the extent that their application is appropriate."). Indeed, in *McDonnell Douglas* itself, the Supreme Court expressed the need for malleable applications of the standard: "The facts necessarily will vary in Title VII cases, and the ... *prima facie* proof required from respondent is not necessarily applicable in every respect to differing factual situations." 411 *U.S.* at 802 n. 13, 93 *S.Ct.* at 1824 n. 13, 36 *L.Ed.*2d at 677 n. 13.

Our Court has generally applied the *McDonnell Douglas* test under Title VII to gender-discrimination claims under the LAD, but has never considered the application of that test to a claim alleging gender discrimination consisting of unequal pay for comparable work. The federal experience indicates that this form of unlawful discrimination has, historically, been considered distinctive because remedial measures are available under laws other than Title VII. Specifically, that kind of discrimination can be vindicated under provisions of the federal Equal Pay Act, 29 *U.S.C.* § 206(d) ("EPA"), the standards and methodology of which differ from those of Title VII.

The difference in the statutory approaches to this form of discrimination can be explained in part by the history and development of the respective federal legislative schemes. Title VII was enacted as part of the comprehensive Civil Rights Act of 1964. 42 *U.S.C.* § 2000e–2. Its focus was and is on a broad range of discriminatory behavior. It generally proscribes all forms of discriminatory employment practices, both overt and those discriminatory in impact. Title VII sweepingly prohibits employers from "fail[ing] or refus[ing] to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment." *Id.; see Griggs v. Duke Power Co.*, 401 *U.S.* 424, 431, 91 *S.Ct.* 849, 853, 28 *L.Ed.*2d 158, 164 (1971). As originally introduced, the Civil Rights Act applied exclusively to racial discrimination, and sex discrimination was included only by a later amendment. *See* 110 Cong.Rec. 2577 (1964).

In contrast, the Equal Pay Act was adopted as an amendment to the minimum wage provisions of the Fair Labor Standards Act of 1938. 29 *U.S.C.* § 206(d). The protections of the EPA were significant in the context of labor and employment law, and its special concern was for the status of women in the work force. Although the EPA "was intended as a broad charter of women's rights in the economic field ... [and] sought to overcome the age-old belief in women's inferiority and to eliminate the depressing effects on living standards of reduced wages for female workers and the economic and social consequences which flow from it," *Schultz v. Wheaton Glass Co.*, 421 *F.*2d 259, 265 (3d Cir.), *cert. denied*, 398 *U.S.* 905, 90 *S.Ct.* 1696, 26 *L.Ed.*2d 64 (1970), its focus is sharp. Unlike Title VII, the EPA concentrates exclusively on assuring "equal pay" in certain situations where members of the opposite sex are performing "equal work." As the Supreme Court stated in *Corning Glass Works v. Brennan*, 417 *U.S.* 188, 195, 94 *S.Ct.* 2223, 2228, 41 *L.Ed.*2d 1, 10 (1974):

Congress' purpose in enacting the Equal Pay Act was to remedy what it perceived to be a serious and endemic problem of employment discrimination in private industry—the fact that the wage structure of "many segments of American industry has been based on an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same." [citations omitted]

Reflecting the different conceptual emphases of Title VII and the EPA, the critical differences between these statutory schemes relate to the standards that define a *prima facie* case and determine the corresponding burden of proof. Although rather clear decisional lines have emerged respecting those important aspects of such statutory claims, courts have not been uniform or consistent in their approaches.

The predicate of discrimination under each statute involves the degree of similarity of the jobs held by female and male employees. A few courts have held that the *prima facie* case in terms of job similarity is the same for Title VII and EPA claims. *See, e.g., Forsberg v. Pacific Northwest Bell Tel.*, 840 *F.*2d 1409, 1418 (9th Cir.1988). Most, however, believe that

there is an appreciable difference in the *prima facie* case that will suffice under the EPA when compared to Title VII.

█ It is generally acknowledged that Title VII, with its broader approach to discrimination, requires a less-exacting degree of job similarity than is necessary to bring an EPA action, with its sharper focus on employment and wage discrimination against females. *Craik v. Minnesota State Univ. Bd.*, 731 *F.*2d 465, 479 (8th Cir.1984); *Epstein v. Secretary of U.S. Dep't of Treasury*, 739 *F.*2d 274, 278 (7th Cir.1984); *Siegel v. Board of Educ. of NYC*, 713 *F.Supp.* 54, 58 (E.D.N.Y.1989); *see also Beall v. Curtis*, 603 *F.Supp.* 1563, 1581 (M.D.Ga.1985) ("a Title VII plaintiff is not required to meet the exacting burden of showing substantial equality of jobs.") Although the Supreme Court itself has declined to prescribe a framework for analyzing wage-discrimination claims under Title VII, it has recognized that the standard of job comparability under the EPA does not apply to Title VII actions, and that the standard of "similarity" in making out a *prima facie* case is less demanding under Title VII in terms of common features of job comparability than the standard under the EPA. *County of Washington v. Gunther*, 452 *U.S.* 161, 101 *S.Ct.* 2242, 68 *L.Ed.*2d 751 (1981).

Frequently, courts have been content to define Title VII standards of *prima facie* proof in relatively broad terms. Minimally, "[i]f establishing a *prima facie* case means anything at all in a Title VII sex-based wage compensation case, the plaintiffs' jobs must be similar in some respect to the group who allegedly received favorable treatment because of their sex." *Beard v. Whitley County REMC*, 656 *F.Supp.* 1461, 1473–74 (N.D.Ind.1987), *aff'd.* 840 *F.*2d 405 (7th Cir.1988). The Supreme Court has observed that under Title VII, "[t]he burden of proving a *prima facie* case is 'not onerous.'" *Watson v. Fort Worth Bank and Trust, supra*, 487 *U.S.* at 986, 108 *S.Ct.* at 2784, 101 *L.Ed.*2d at 839 (quoting *Burdine, supra*, 450 *U.S.* at 253, 101 *S.Ct.* at 1093, 67 *L.Ed.*2d 207).

 In contrast, under the EPA, a claimant must meet a more exacting *prima facie* case standard. She must show that her salary was lower than that paid by the employer to "employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 *U.S.C.* § 206(d)(1). The claimant bears the onus of demonstrating that the work unequally recompensed was "substantially equal." *Schultz, supra,* 421 *F.*2d 259; *Waters v. Turner, Wood & Smith Ins. Agency,* 874 *F.*2d 797, 799 (11th Cir.1989). An equal-work comparison should focus on whether the jobs have a "common core" of tasks, that is, " 'whether a significant portion of the two jobs is identical.' " *Fallon v. Illinois,* 882 *F.*2d 1206, 1209 (7th Cir.1989) (quoting *Brewster v. Barnes,* 788 *F.*2d 985, 991 (4th Cir.1986)). Factors to be considered include quantity and quality of production, education, relevant prior work experience, conduct, and skill. *See* 29 *CFR* § 1620.13. If in the aggregate, the jobs require substantially similar skills, efforts, and responsibilities, the work should be adjudged equal despite minor variations. *See Fallon, supra,* 882 *F.*2d at 1209; *Peters v. City of Shreveport,* 818 *F.*2d 1148, 1153 (5th Cir.1987), *cert. dismissed,* 485 *U.S.* 930, 108 *S.Ct.* 1101, 99 *L.Ed.*2d 264 (1988).

 Once the plaintiff has established a *prima facie* case under either Title VII or the EPA, the burden shifts to the defendant to demonstrate that the difference in pay was justified. However, the extent of this shift is critically different under the respective statutes. Under the EPA, once a *prima facie* case has been established, a defendant must establish by a preponderance of evidence one of four affirmative defenses in order to avoid liability. 29 *U.S.C.* § 206(d). It must prove that the wage disparity is the result of (i) a seniority system, (ii) a merit system, (iii) a system which measures earnings by quantity or quality of production, or (iv) a differential based on any factor other than sex. *See Corning Glass Works, supra,* 417

*U.S.* at 196, 94 *S.Ct.* at 2229, 41 *L.Ed.*2d at 11; *Peters, supra,* 818 *F.*2d at 1153.

Title VII takes a different approach. It is true that "under Title VII, the employer bears the burden of showing that the wage differential resulted from a factor other than sex," *Kouba v. Allstate Ins. Co.*, 691 *F.*2d 873, 875 (9th Cir.1982), but while Title VII explicitly incorporates the EPA defenses,[3] a defendant is not confined to these affirmative defenses in overcoming a plaintiff's *prima facie* case. More significantly, a defendant is not required to establish these non-discriminatory reasons, or other defenses, by any particular evidential showing under Title VII. The burden on the employer is to articulate a legitimate reason for the apparent discriminatory treatment that can dispel the inference that this unequal treatment was caused by an intent to discriminate because of gender-bias. *See Andersen v. Exxon, supra,* 89 *N.J.* at 499, 446 *A.*2d 486. Thus, "[t]he Equal Pay Act standard [which] requires an employer to rebut a *prima facie* case of compensation discrimination with a preponderance of the evidence, differs substantially from the evidentiary burden a defendant must shoulder in a Title VII case." *Schulte v. Wilson Indus.,* 547 *F.Supp.* 324 (D.Tex.1982); *see Price v. Lockheed Space Operations,* 856 *F.*2d 1503 (11th Cir.1988).

EPA standards governing the burden of proof are generally applied in a gender-discrimination claim of unequal pay for equal work whether or not the allegations expressly or specifically assert a violation of the EPA or Title VII. Regardless, such claims are construed as intending to allege and demonstrate the higher degree of job comparability, *i.e.*, the "substan-

---

[3]This incorporation was specifically brought into Title VII under the so-called Bennett Amendment, which reads as follows:

It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29. [42 *U.S.C.* § 2000e–2(h).]

tially equal" standard that is central to an EPA claim, serving to impose on the employer the greater burden of proof. *See, e.g., Marcoux v. Maine,* 797 *F.*2d 1100 (1st Cir.1986); *McKee v. Bi–State Dev. Agency,* 801 *F.*2d 1014, 1019 (8th Cir.1986); *Foster v. Arcata Assocs.,* 772 *F.*2d 1453, 1465 (9th Cir.1985); *Kouba v. Allstate Ins. Co., supra,* 691 *F.*2d at 875; *Orahood v. Board of Trustees,* 645 *F.*2d 651, 654 (8th Cir.1981); *Odomes v. Nucare, Inc.,* 653 *F.*2d 246, 250 (6th Cir.1981); *Gunther v. County of Washington,* 623 *F.*2d 1303, 1319 (9th Cir.1979), *aff'd on other grounds,* 452 *U.S.* 161, 101 *S.Ct.* 2242, 68 *L.Ed.*2d 751 (1981). However, a minority of courts take a different approach. They have held that the statutory cause of action that is alleged in the complaint governs its disposition. Hence, if an action is brought expressly under Title VII, these courts have used the *McDonnell Douglas* standard, even if a classic EPA claim is expressed by, or can be inferred from, the allegations. *E.g., Seligson v. M.I.T.,* 677 *F.Supp.* 648, 654 n. 2 (D.Mass.1987); *EEOC v. Sears, Roebuck & Co.,* 628 *F.Supp.* 1264, 1328–32 (N.D.Ill.1986); *Derouin v. Louis Allis Div.,* 618 *F.Supp.* 221, 224 (E.D.Wis.1985); *Crockwell v. Blackmon–Mooring Steamatic Inc.,* 627 *F.Supp.* 800 at 806 (W.D.Tenn. 1985).

The Appellate Division below construed the complaints as projecting claims of unequal pay for equal work and determined that under the LAD the analysis applicable in a classic EPA case should be followed rather than the Title VII analysis incorporating the *McDonnell Douglas* standard. The court accepted the trial court's finding that plaintiffs and their male co-workers "were assigned to perform essentially the same task" and concluded that the plaintiffs met their burden of establishing a *prima facie* case of substantial job equality. 226 *N.J.Super.* at 531, 545 *A.*2d 185. It also determined that this showing by the plaintiffs shifted the burden of proof to defendants to establish by a preponderance of the evidence that the reasons for the wage differentials fell within one of the categories of affirmative defenses recognized under the EPA. The court then concluded that defendants had failed to meet this

burden of proof and reversed the trial court's judgment in favor of defendants. *Id.* at 531–532, 545 *A.*2d 185.

Defendants contend, however, that the LAD generally tracks Title VII, and that the Appellate Division erred in utilizing an EPA analysis, rather than the *McDonnell Douglas* standard, to determine this case. Plaintiffs disagree, arguing that the Appellate Division's selection and application of legal standards was correct because an EPA analysis should govern equal-pay claims that meet EPA standards even when brought under Title VII, and, by implication, the LAD.

As earlier observed, this Court has not previously defined the elements of a gender-employment-discrimination action involving wage disparity in the performance of comparable work. Moreover, the Supreme Court itself has not determined this choice of law. *See Gunther, supra,* 452 *U.S.* at 166 n. 8, 101 *S.Ct.* at 2246 n. 8, 68 *L.Ed.*2d at 758 n. 8 ("we do not decide in this case how sex-based wage discrimination under Title VII should be structured."). In a Title VII action, the question of what standards apply to a gender-discrimination case consisting of unequal pay remains an open one under federal law. *Crockwell v. Blackmon–Mooring Steamtic, Inc., supra,* 627 *F.Supp.* at 806 (The Supreme Court "left unresolved whether the standard Title VII rules of *McDonnell Douglas* ... apply to the order and allocation of proof in Title VII sex-based wage discrimination claims or whether the employer has the burden of proving its actions justified by one of the Equal Pay Act defenses.") Nevertheless, the clear weight of federal authority supports plaintiffs' position. *E.g., Covington v. Southern Illinois Univ.,* 816 *F.*2d 317, 321 (7th Cir.), *cert. denied,* 484 *U.S.* 848, 108 *S.Ct.* 146, 98 *L.Ed.*2d 101 (1987); *Maxwell v. City of Tucson,* 803 *F.*2d 444, 446 (9th Cir.1986); *Kouba v. Allstate Ins. Co., supra,* 691 *F.*2d at 875; *Piva v. Xerox Corp.,* 654 *F.*2d 591, 598–99 n. 5 (9th Cir.1981); *Odomes v. Nucare Inc., supra,* 653 *F.*2d at 250–51; *Parker v. Burnley,* 693 *F.Supp.* 1138, 1150 (N.D.Ga.), *modified on other grounds,* 703 *F.Supp.* 925 (1988); *Denny v. Westfield State College,* 669 *F.Supp.* 1146 at 1155–56

(D.Mass.1987); *Chang v. University of Rhode Island,* 606 *F.Supp.* 1161, 1188 (D.R.I.1985); *Schulte v. Wilson Indus., supra,* 547 *F.Supp.* at 339–40; *Melanson v. Rantoul,* 536 *F.Supp.* 271, 286 (D.R.I.1982).

This weight of authority is persuasive because its underlying perception of the interests involved is fully compatible with our own philosophy under the LAD and our surrounding public policies. As noted, *supra* at 96–97, 570 *A.*2d at 906, the LAD represents a strong commitment to counteract discrimination attributable to sex or gender, an evil that is felt acutely in terms of employment and economic treatment. In addition, the State has long had a Equal Pay Act, *N.J.S.A.* 34:11–56.2, directed specifically toward wage discrimination against females. That statute provides:

> No employer shall discriminate in any way in the rate or method of payment of wages to any employee because of his or her sex. A differential in pay between employees based on a reasonable factor or factors other than sex shall not constitute discrimination within the meaning of this section.

Although the statute has remained dormant, that is explained in part by the circumstance that other legislative schemes have been invoked to supplement its protective measures and assure its societal goals. Still, it exemplifies an enduring legislative policy that is protective of the interest and status of women in the employment setting. The Legislature's desire to protect women against sex-based wage discrimination, which led to the enactment of the State's EPA in 1952, was reaffirmed by the 1970 amendment to the LAD, which added to the statute protections against discrimination based on marital status or sex. Thus, the goals and policy of the EPA are mirrored in the LAD. *See supra* at 96–97, 570 *A.*2d at 906.

In the federal context, it has also been recognized that "Title VII and the Equal Pay Act are to be read in *pari materia* and neither should be interpreted in a manner that would undermine the other." *Parker v. Burnley, supra,* 693 *F.Supp.* at 1150; *see Denny v. Westfield, supra,* 669 *F.Supp.* at 1155–56 ("the Bennett amendment is a device intended to harmonize the protections of two, somewhat overlapping statutory schemes by

incorporating EPA's four affirmative defenses into Title VII."); *accord Patkus v. Sangamon–Cass Consortium,* 769 *F.*2d 1251, 1260 n. 5 (7th Cir.1985); *Ammons v. Zia,* 448 *F.*2d 117, 119 (10th Cir.1971); *see also* 29 *C.F.R.* § 1620.27 (where jurisdictional prerequisites of Title VII and EPA established, any violation of latter is also violation of former).[4] We have recognized a similar need to harmonize our LAD with Title VII and have borrowed heavily from the federal experience to assure some reasonable degree of symmetry and uniformity. *See, e.g., Erickson v. Marsh & McLennan, supra,* 117 *N.J.* 539, 569 *A.*2d 793; *Shaner v. Horizon Bancorp., supra,* 116 *N.J.* 433, 561 *A.*2d 1130; *Andersen v. Exxon, supra,* 89 *N.J.* 483, 446 *A.*2d 486; *Peper v. Princeton Univ., supra,* 77 *N.J.* 55, 389 *A.*2d 465.

To reiterate, the Court has incorporated Title VII philosophy into the LAD, but has applied the Title VII standards with flexibility. *See supra* at 97–98, 570 *A.*2d at 907. This exemplifies the Supreme Court's understanding when, in announcing the *McDonnell Douglas* decision, it recognized the need for flexibility: "The facts necessarily will vary in Title VII cases, and the specification ... of the *prima facie* proof required from respondent is not necessarily applicable in every respect to differing factual situations." 411 *U.S.* at 802 n. 13, 93 *S.Ct.* at 1824 n. 13, 36 *L.Ed.* at 677 n. 13. Thus, we have not hesitated to depart from the *McDonnell Douglas* methodology if a rigid application of its standards is inappropriate under the circumstances. In *Erickson v. Marsh & McLennan, supra,* for example, a gender-bias case in the employment context, the Court ruled that the first-prong of the *McDonnell Douglas* test, that the complainant was one of a "protected class," should be altered to require complainant, a white male, to show that his employer was the "unusual employer who discriminates against the majority" and that he was intentionally discrimi-

---

[4]This provision was enacted in 1986, after plaintiffs' cause of action arose. Section 1620 replaced Section. 800. *See Federal Register,* Vol. 52, no. 15, January 23, 1987, p. 2517.

nated against despite his majority status. *Id.* at 98, 570 *A.*2d at 907. In a variant context involving employment discrimination based on physical handicap, we expressed general approval of the EPA burden-shifting approach: "Our decision on this issue comports with the similar shifting of the burden of proof of affirmative defenses to the employer in suits brought in federal courts under the Equal Pay Act." *Andersen v. Exxon, supra,* 89 *N.J.* at 500 n. 6, 446 *A.*2d 486. Similarly, in *Jansen v. Food Circus,* 110 *N.J.* 363, 541 *A.*2d 682 (1988), also a handicap employment-discrimination case, we employed the EPA affirmative defenses and shift of the burden of proof, rather than a Title VII framework. Recently the Supreme Court itself, in *Price Waterhouse v. Hopkins,* —— *U.S.* ——, 109 *S.Ct.* 1775, 104 *L.Ed.*2d 268 (1989), looked to classic EPA analysis for guidance in ruling that Title VII demands that in situations in which an employee shows that her gender played a part in her not receiving a promotion, the burden of proof shifts to the employer to prove "by a preponderance of the evidence that it would have made the same decision even if it had not taken plaintiff's gender into account." *Id.* at ——, 109 *S.Ct.* at 1795, 104 *L.Ed.*2d at 293.

Thus, the reasons that impelled the Court to adopt an EPA analysis in other settings have similar cogency in this context, posing a gender-discrimination issue that is identical to a classic EPA claim. Not only is application of the EPA methodology supported by a long-standing legislative commitment to wage equality without regard to sex, it furthers a distinctive public policy directed to improving the status of women in the work force, particularly with respect to their compensation. This approach is also clearly consistent with the imputed but strong legislative intent to harmonize the State's anti-discrimination statutes with the dominant federal view to maximize the protections for the victims of discrimination and, indeed, to benefit all of society by these efforts.

Moreover, the inference is virtually inescapable that when unequal pay is given for the performance of substantially

equal work, impermissible discrimination is afoot. If there is some other, proper reason for the seeming inequality, it is the employer who, uniquely, is in a position to know the reason, and it is only fair to require the employer to persuasively articulate that reason and dispel the inference of invidious discrimination. Indeed, such considerations have persuaded some courts to formulate an analogous approach to Title VII wage-discrimination claims, an approach that recognizes that the high degree of job similarity required in an EPA claim is the functional equivalent of purposeful discrimination. *See, e.g., American Nurses' Ass'n v. Illinois,* 783 *F.*2d 716, 721 (7th Cir.1986) (to succeed under Title VII, a plaintiff who shows only that her job was similar to that of a male co-worker must also demonstrate she was intentionally discriminated against because she is a woman; however, if she shows that her job was substantially equal to that of a male co-worker who was paid more, she need not prove intentional gender bias); *Spaulding v. University of Washington,* 740 *F.*2d 686 (9th Cir.), *cert. denied,* 469 *U.S.* 1036, 105 *S.Ct.* 511, 83 *L.Ed.*2d 401 (1984) (same); *Gallagher v. Kleinwort Benson Government Sec. Inc.,* 698 *F.Supp.* 1401, 1405 (N.D.Ill.1988) (same). Thus, a complainant who is able to show that "substantially equal" jobs have been compensated unequally has demonstrated, in effect, a rebuttable presumption of an intent to discriminate on the part of the employer. *See Corning Glass Works, supra,* 417 *U.S.* at 195, 94 *S.Ct.* at 2228, 41 *L.Ed.*2d at 10; *Fallon v. Illinois, supra,* 882 *F.*2d at 1216 n. 11. When a plaintiff establishes that she has performed substantially equal work for unequal pay, a strong inference of discrimination is created. In cases in which such a strong inference has been established, other direct evidence of intent to discriminate need not be adduced, and it is appropriate to shift the burden of proof to the employer to show why the court should not determine that its practices are discriminatory.

Accordingly, we hold that in a case brought under the LAD presenting a gender-discrimination claim based on the payment of unequal wages for the performance of substantially

equal work, the standards and methodology of the EPA should be followed. These encompass the elements that comprise both a *prima facie* case and the corresponding transfer of the burden of proof. We also determine that a *prima facie* case is established if a female complainant can demonstrate that unequal pay was given for the performance of work that is substantially equal to that performed by male employees. If the complainant establishes a case of "substantially equal" work that is compensated at different rates of pay, then the defendant has the burden of proof to establish by a preponderance of the evidence the affirmative defenses delineated under the EPA and incorporated into Title VII to overcome the charge of unlawful discrimination.

We further determine that if such a complainant in an action brought under the LAD based on gender-discrimination fails to satisfy the standards of a *prima facie* case of "substantially equal" work, as prescribed by the EPA, but the evidence demonstrates a lesser degree of job similarity that would nonetheless satisfy the less-exacting standards of a *prima facie* case under Title VII, the burden that shifts to the defendant should be only the burden of production or explanation. Thus, if such a complainant is able to show only that the work is "similar," then the defendant will be required to articulate a legitimate non-discriminatory reason for the treatment of the plaintiff, and the ultimate burden of persuasion shall remain on the plaintiff.

### III.

We must decide, therefore, whether plaintiffs in this case have established a *prima facie* case under either the EPA standard or the *McDonnell Douglas* –Title VII standard. If they have done so, the further question remains whether defendants have sustained their appropriate corresponding procedural obligation. If it appears that defendants have not met their proper burden, the final inquiry is whether defendants were

fairly apprised of the standards under which the case was to be determined.

As noted earlier, the Appellate Division below determined that plaintiffs made a *prima facie* showing of "substantial equality" under the classic EPA analysis. That determination was based on the trial court's finding that the people on the Team were "assigned to perform essentially the same task for two years." Each Team member was chosen because he or she had proven to be effective in a different area of corporate activity. It can be inferred that the jobs were all "closely related" and "very much alike," and called for "substantially equal skill, effort and responsibility, and similar working conditions." *See Hodgson v. Miller Brewing Co.*, 457 F.2d 221, 227 (7th Cir.1972); *see Melanson v. Rantoul, supra*, 536 F.Supp. at 286.

Assuming that the trial court's finding can be equated with a *prima facie* case that satisfied the standard of substantial job equality, we must determine whether defendants sustained their burden of proof to establish, by a preponderance of the evidence, any of the affirmative defenses under the classic EPA methodology. *See supra* at 108, 570 A.2d at 912–913.

■ The trial court found that the fact that Jordan was paid more than men on the Team undercut plaintiffs' claims of wage discrimination based on sex. As the Appellate Division noted, however, the fact that one member of a protected group is not a victim of discrimination does not preclude others in the group from prevailing on a discrimination claim. *Connecticut v. Teal*, 457 U.S. 440, 455, 102 S.Ct. 2525, 2535, 73 L.Ed.2d 130, 142 (1982) (employer does not have license to discriminate against some employees on basis of race or sex merely because other members of group are favorably treated); *Catlett v. Missouri Highway & Transp. Comm'n*, 828 F.2d 1260, 1266 (8th Cir. 1987), *cert. denied*, 485 U.S. 1021, 108 S.Ct. 1574, 99 L.Ed.2d 889 (1988) (female victims of discrimination cannot be told they were not wronged because other females hired).

■ The defendants' contention that the wage differentials are justified "because the transfer to MRP manager was lateral and short-term" is equally unpersuasive. As the Appellate Division observed, it makes no difference "that the wage differentials are residuals of earlier employment, when the same men and women performed unequal work." 226 *N.J.Super.* at 532, 545 *A.*2d 185. Also, as plaintiffs noted, federal regulations in effect at the time the cause of actions accrued, 29 *C.F.R.* § 800.147, provided that unequal pay may be given for equal *temporary* work, but failure to pay the higher rate for over one month will raise questions of whether the assignment was in fact temporary. The assignment here was for two years.

Moreover, even if we assume, as urged by defendants, that the *McDonnell Douglas* standard was applicable and that only a *prima facie* case of job similarity was established, defendants would be required to articulate a legitimate reason for the unfavorable treatment of plaintiffs. None of their proffered explanations, however, constitutes a permissible or legitimate reason for the wage discrimination against plaintiffs. Defendants simply could not articulate a sensible reason for the "freezing" of salary levels.

Defendants contend, however, that even if the record can be viewed as sustaining plaintiffs' position, the standards that must be applied to reach that result were not anticipated by the parties or applied by the trial court. Hence, any factual determinations cannot reliably be related to those standards; moreover, according to defendants, the Appellate Division's adoption of those standards is unfair because the parties did not approach or present their case with this understanding. They argue, for example, that Grigoletti never clearly asserted an equal-pay-discrimination claim as such, but alleged only more generalized employment discrimination because of sex. They also find support for this in the fact that the trial court tried the case under the conventional *McDonnell Douglas* approach, leaving the ultimate burden of persuasion on the plaintiffs.

Grigoletti's complaint alleges that she received unequal pay even though she had "equal responsibilities" and the Team members were in "equal positions." This, perhaps, can be equated with a classic EPA claim, which, as noted, requires a showing of substantial job equality and unequal pay. Moreover, as we have now made clear, such a claim would subsume or include the similar-job/unequal-pay standard under the *McDonnell Douglas* approach. Defendant's position, nevertheless, gives us pause.

Grigoletti's allegations could well generate confusion over the nature and extent of job comparability that was intended to be relied on by plaintiffs or that was to be anticipated by defendants. While there is ample evidence in the record regarding the substantial equality of the work, nowhere in the trial court's opinion are any applicable legal standards proffered. The trial court did not structure the case in a fashion that was consistent with any identifiable approach. As in *Glenn v. General Motors Corp.*, 841 *F*.2d 1567, 1569 (11th Cir.), *cert. denied*, —— *U.S.* ——, 109 *S.Ct.* 378, 102 *L.Ed.*2d 367 (1988), " 'It is important to bear in mind that the *prima facie* case is made out by comparing the jobs held by the female and male employees and showing that these jobs are substantially equal, not by comparing the skills and qualifications of the individual employees holding those jobs.' " (quoting *Brock v. Georgia Southwestern College*, 765 *F*.2d 1026, 1032 (11th Cir. 1985)). It is not clear whether the trial court engaged in that kind of comparison. Even though the court found the work "essentially similar," and the plaintiffs most likely would have established a *prima facie* case under the more lenient *McDonnell–Douglas* test, defendants, presented with the identical case under the appropriate legal standards, namely, the EPA analysis and burdens, might well have presented different proofs relevant to that standard.

██ The Appellate Division, as noted, ruled in favor of plaintiffs on their claims of gender discrimination but remanded

the matter for a determination of damages. We are satisfied, however, that the case should be remanded for a retrial on the issues of gender discrimination, as well as damages. In this connection, we also affirm, for the reasons given by the Appellate Division, its reversal of the trial court's denial of Impellizerri's motion to amend her complaint to allege this cause of action. 226 *N.J.Super.* at 532, 545 *A.*2d 185.

On remand, the focus of the trial court with respect to gender discrimination should be the issue of job comparability. The plaintiffs should clarify whether they intend to show substantial equality among the jobs involved. That would entail a comparison of the job requirements, skills, and efforts involved, as well as the working conditions that applied, rather than on the people who filled those jobs or their particular qualifications therefor. Admittedly, all Team members held the title "MRP Project Manager." However, "[a]lthough job titles are entitled to some weight in the assessment of comparative responsibility, '[t]he controlling factor under the Equal Pay Act is job content—the actual duties that the respective employees are called upon to perform.'" *Curtis, supra,* 603 *F.Supp.* at 1577 (quoting *Hodgson v. Brookhaven Gen. Hosp.,* 436 *F.*2d 719, 724 (5th Cir.1970)).

If the responsibilities on the modules of the various members of the MRP group are determined to have been substantially the same, then the "substantially equal" test should be satisfied. *See generally* Sullivan, "The Equal Pay Act of 1963: Making and Breaking a Prima Facie Case," 31 *Ark.L.Rev.* 545 (1978) (discussing elements of a *prima facie* case under the EPA). In that event, defendants would be required to establish by a preponderance of the evidence one of the four affirmative defenses under the EPA for the unequal compensation. If, however, plaintiffs establish only that the comparable jobs are "similar," then defendants shall be required to advance legitimate, non-discriminatory explanations for the unequal compensation, and the ultimate burden of proof would remain on

plaintiffs to establish that their unequal wages were attributable to discrimination on account of their gender.

## IV.

The final issue for determination is whether plaintiffs are entitled to relief under their claims of wrongful discharge. The plaintiffs alleged that their discharges were violative of Ortho's employment manuals and policies. Those allegations require us to determine whether our decision in *Woolley v. Hoffmann–La Roche,* 99 *N.J.* 284, 491 *A.*2d 1257, *modified* 101 *N.J.* 10, 499 *A.*2d 515 (1985), applies to this case. *Woolley* recognized a cause of action for wrongful discharge of an at-will employee, not otherwise protected by an employment contract, based on a violation of the employer's expressed employment standards and practices.

The applicability of the *Woolley* principle is at issue here because plaintiffs' alleged wrongful discharges occurred in 1984, prior to the issuance of the *Woolley* decision. The trial court dismissed plaintiffs' *Woolley* claims because "the operative facts giving rise to plaintiffs' complaint[s] occurred sometime before the *Woolley* holding," and *Woolley* should not be given "retroactive application," citing *Bimbo v. Burdette Tomlin Memorial Hospital,* 644 *F.Supp.* 1033 (D.N.J.1986). The Appellate Division reversed, reasoning that *Woolley* applied retroactively because that decision was foreshadowed by other decisions of this Court and of the Appellate Division, and thus did not represent "a sharp break with prior law." 226 *N.J.Super.* at 526, 545 *A.*2d 185. Because there was no record before it on which to assess the validity of plaintiffs' wrongful-discharge claims, the Appellate Division did not address the merits of those claims. *Id.* at 528, 545 *A.*2d 185.

Our courts have followed the standards governing retroactivity enunciated by the Supreme Court in *Chevron Oil Co. v. Huson,* 404 *U.S.* 97, 92 *S.Ct.* 349, 30 *L.Ed.*2d 296 (1971), as adopted in *Coons v. American Honda Motor Co.,* 96 *N.J.* 419,

427, 476 A.2d 763 (1984), *cert. denied,* 469 *U.S.* 1123, 105 *S.Ct.* 808, 83 *L.Ed.*2d 800 (1985). Both the *Chevron* standards and our own decisional law make it clear that *Woolley* should not be afforded retroactive application.

 We have always understood that decisions establishing a new principle of law by overruling past precedent or resolving an issue of first impression in a way not foreshadowed by past decisions should not be granted retroactive application. *Merenoff v. Merenoff,* 76 *N.J.* 535, 560, 388 A.2d 951 (1978) (interspousal tort immunity does not bar personal injury suits between married persons but, "in view of the significant change in the law," the decision should be prospective only). If application of the decision clearly upsets the settled order of things and results in unfair surprise and hardship, this would be a tell tale that it ought to be given only prospective effect. *Darrow v. Hanover Township,* 58 *N.J.* 410, 420, 278 A.2d 200 (1971) ("Prospectivity can avoid unsettling the past and serve as an encouragement for judicial creativity."); *accord Coons, supra,* 96 *N.J.* 419, 476 A.2d 763.

 It is not easy to determine whether a decision indeed does constitute a novel proposition of law reasonably and fairly requiring its prospective application. *Compare Kelly v. Gwinnell,* 96 *N.J.* 538, 476 A.2d 1219 (1984) (doctrine of social-host liability given prospective application) *with Mirza v. Filmore Corp.,* 92 *N.J.* 390, 399, 456 A.2d 518 (1983) (demise of limited immunity from liability for sidewalk conditions "had been foreshadowed, at least in part, for years," and thus decision given retroactive application). *Woolley,* however, falls within the doctrinal framework calling for prospectivity. While it may have had its conceptual origins in antecedent contract law, it involved a novel and unanticipated interpretation and application of that law and, in fact, altered the basic structure of employer/at-will-employee relations. The *Woolley* holding is concededly nourished by *Pierce v. Ortho Pharmaceutical Corp.,* 84 *N.J.* 58, 417 A.2d 505 (1980), but it may be contrasted

with *Pierce.* In *Pierce,* we held that an at-will employee had a cause of action for wrongful discharge if terminated in a way contrary to public policy. *Id.* at 65–66, 417 *A.*2d 505. We observed in *Pierce,* however, that "employers will know that unless they act contrary to public policy, they may discharge employees at will for any reason." 84 *N.J.* at 73, 417 *A.*2d 505.

Moreover, while we expressly based our holding in *Pierce* on contract, we also founded our thinking on tort principles. *Id.* at 72–73, 417 *A.*2d 505. Thus, the decision can hardly be said to have presaged our holding in *Woolley.* *Woolley* took a quantum leap forward in holding that contractual obligations could be implied in fact from an employment manual, and gave such manuals and similar employer policies a legal significance not theretofore found. The decision forever changed the balance of power between certain employers and their at-will employees. After *Woolley,* such employers no longer possessed the virtually unfettered freedom to terminate at-will employees.

We are convinced now, as we were convinced then, that *Woolley* made fundamentally new law. The previous relevant decisions on employment law were predominantly uniform and consistent. Although, as noted, the Court in *Woolley* found support for its result in *Pierce,* as well as in *Anthony v. Jersey Central Power & Light Co.,* 51 *N.J.Super.* 139, 143 *A.*2d 762 (App.Div.1958), the fact that those decisions were used to support a new principle of law by no means establishes the fact that they clearly foreshadowed it. *Marino v. Bowers,* 657 *F.*2d 1363, 1367 (3rd Cir.1981). The *Woolley* decision itself acknowledged the newness of its pronouncements, by pointing out that "most out-of-state cases demonstrate an unwillingness to give contractual force to company policy manuals...." 99 *N.J.* at 294, 491 *A.*2d 1257. Additionally, *Woolley* was clearly perceived at the time of the decision as bold, new law. *See, e.g.,* "To Fire at Will?," 116 *N.J.L.J.* 324, col. 1 (September 5, 1985) (*Woolley* sent "at will ... on the way out, venerability and universality notwithstanding.").

In sum, we are satisfied that our holding in *Woolley* was not clearly foreshadowed. For that reason, we decline to apply *Woolley* retroactively. Plaintiffs' wrongful discharge claims are therefore barred.

## V.

The judgment of the Appellate Division is modified in part and reversed in part, and the matter is remanded to the Superior Court, Law Division, for disposition consistent with this opinion.

*For modification in part, reversal in part and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—7.

*Opposed*—None.