164 A.3d 1030

MARYANNE GRANDE, R.N., PLAINTIFF-RESPONDENT,
v. SAINT CLARE'S HEALTH SYSTEM,
DEFENDANT-APPELLANT.

Argued January 31, 2017—Decided July 12, 2017

*Sean R. Gallagher* (*Polsinelli, PC*) of the Colorado bar, admitted pro hac vice, argued the cause for appellant (*McCarter & English, LLP* and *Polsinelli, PC*, attorneys; *Thomas F. Doherty, Sean R. Gallagher*, and *Gillian McKean Bidgood* (*Polsinelli, PC*) of the Colorado bar, admitted pro hac vice, on the briefs).

*Noel C. Crowley* argued the cause for respondent (*Crowley & Crowley*, attorneys).

*Richard M. Schall* argued the cause for amicus curiae National Employment Lawyers Association of New Jersey (*Schall & Bar-*

*asch, LLC* and *Zuckerman & Fisher, LLC,* attorneys; *Richard M. Schall* and *Elizabeth R. Zuckerman* on the brief).

*Benjamin Folkman* argued the cause for amicus curiae New Jersey Association for Justice (*Folkman Law Offices, PC,* attorneys; *Benjamin Folkman, Lauren M. Law, Eve R. Keller, Sarah A. M. Slachetka, Paul C. Jensen, Jr.,* on the brief).

JUSTICE SOLOMON delivered the opinion of the Court.

We are called upon to determine whether in this action brought under New Jersey's Law Against Discrimination (LAD), *N.J.S.A.* 10:5-1 to -49, the Appellate Division correctly reversed the trial court's grant of summary judgment in favor of defendant Saint Clare's Health System and against plaintiff Maryanne Grande, R.N. Because we conclude that, on the record before the trial court, issues of material fact exist, we affirm and modify the judgment of the Appellate Division and remand the matter to the trial court for further proceedings.

I.

A.

We glean the following facts from the record considered by the trial court, including Grande's deposition, certifications by Saint Clare's and its agents, various exhibits contained within each party's summary judgment motion, and associated statements of material facts.

Grande has been a practicing registered nurse (R.N.) since 1985. She was employed by Saint Clare's from approximately 2000 through July 2010. Beginning in about 2006, Grande worked in a hospital unit in which approximately half of the patients were stroke victims who required additional assistance with their daily living needs. Grande's regular duties involved maintaining charts, administering medication, and general patient care, including assisting patients with daily living activities such as washing, bathing, dressing, walking, repositioning patients in bed, and guarding

ambulant patients against falls. Thirty to forty percent of the patients in Grande's unit wore armbands and had signage placed outside their hospital rooms to alert staff that they were at an increased risk of falling.

In August 2008, the hospital performed job system analyses for various nursing positions. The job analysis for R.N.s (Job Analysis) indicated the frequency with which job duties were to be performed and identified certain tasks as essential to the R.N. position regardless of how frequent their performance. The Job Analysis categorized occasional tasks as those performed "1–33% of the day" and frequent tasks as those performed "34–66% of the day." Essential tasks were described as the "[e]ssential function[s] of [the] job." One essential duty of an R.N. is to lift fifty pounds from waist to chest "frequently." According to the certification of Heather Jordan, Saint Clare's human resources supervisor, the weightlifting requirements within the Job Analysis are identical for all R.N.-staffed units in the hospital.[1]

Beginning in 2007, prior to the Job Analysis, Grande suffered a series of work-related injuries. The first occurred in March 2007, when she injured her left shoulder while repositioning a patient in bed. Grande was unable to continue working that day, immediately saw a doctor, and reported the incident to Saint Clare's. She had surgery on her shoulder in April, followed by physical therapy. Grande spent about three months recovering at home before returning to work on a full-time but "light duty" basis, which included chart administration, compliance review, and similar administrative tasks. Less than a month later, Grande returned to full duty, including patient care.

---

[1] The only job description provided by the hospital is the Job Analysis, prepared in 2008, eight years after Grande began working at Saint Clare's. The description indicates that it applies to "Job Title: Nursing, RN, LPN, NA; Acute Care, Medical–Surgical, Emergency Services." It makes no distinction between R.N.s working in the stroke ward and those in acute care, medical-surgical, or emergency services. There is nothing in the record that indicates a similar job description existed prior to 2008.

The second injury occurred in May 2008, when Grande felt pain in her right shoulder while repositioning a patient in bed. Grande reported the incident immediately to Saint Clare's and saw a doctor, who performed a magnetic resonance imaging (MRI). The test found no injury, and Grande returned to full duty within two weeks. The record is unclear as to whether Grande's work was restricted following the May 2008 injury.

In November 2008, Grande re-injured her left shoulder while lifting the legs of a 300–pound patient. As before, Grande immediately saw a doctor and reported the incident to her employer. Grande was unable to return immediately to work, underwent a second surgery on her left shoulder, and returned to full duty about six months after the incident.

Grande sustained her final injury in February 2010 when she was alone in a room caring for an overweight patient who was moving from a stretcher to a bed. While Grande stood on the far side of the bed, the patient began to fall. Grande leapt onto the bed, grabbed the patient's shoulders from behind, and pulled the patient onto the bed and on top of herself. After doing so, Grande felt a sharp pain and believed she had re-injured her left shoulder, but an MRI revealed that she had injured her cervical spine. Grande underwent surgery and spent four months recovering and rehabilitating before returning to work. On her first day back, however, she left the hospital after just four hours because of residual pain. Two weeks later, Grande returned to full-time, light-duty work.

In early July 2010, Grande's doctor cleared her to resume full-duty work. The hospital informed Grande that, before returning to full duty, she would have to undergo physical testing. Lori Briglio, the nurse case manager overseeing Grande's workers' compensation claim, instructed Grande to report to Kinematic Consultants, Inc. (KCI) for a functional capacity evaluation (FCE).

Grande complied and underwent the examination, which tested her ability to perform a variety of physical tasks, including turning her head, demonstrating mobility in her limbs, lifting objects from

different heights, turning in different directions, pushing and pulling, and carrying weights. The report documenting the evaluation (KCI Report) provided results in several categories and compared Grande's ability with her employer's requirements and with the standards set forth in the Dictionary of Occupational Titles (D.O.T.).[2] The Report specified that Grande's job demanded that she perform tasks involving pushing, pulling, and lifting from waist to chest frequently (34–66% of the time), but that she was able to perform these functions only occasionally (1–33% of the time). Accordingly, the Report recommended maximum loads for Grande to bear, including that Grande frequently lift no more than sixteen pounds from waist to chest.

The KCI Report also provided several conclusions about Grande's performance throughout the evaluation and her work abilities. The Report acknowledged that Grande had "demonstrated maximum effort" throughout the evaluation and confirmed that the documented results "are considered to be valid." The Report noted that Grande's results "may be compatible with mild residual functional issues, as per complaints and/or diagnosis," but concluded that "[i]t is improbable that this will significantly affect job performance ability."

The Report also explained that Grande qualified to return to work on "altered duty" based on the Report's recommendations. Due to Grande's previous cervical surgery, the Report recommended that Grande be "allowed changes in activities during periods of prolonged or repetitive" neck movements. The Report also recommended that Grande "seek appropriate assistance with

---

[2] The D.O.T. was "a catalogue of the occupational titles used in the U.S. economy" and was intended to provide "reliable descriptions of the type of work performed in each occupation." John C. Dubin, *The Labor Market Side of Disability–Benefits Policy and Law*, 20 *S. Cal. Rev. L. & Soc. Just.* 1, 3 n.7 (2011) (citation omitted). The U.S. Department of Labor published its last updated edition of the D.O.T. standards in 1991. *Ibid.* The D.O.T. was subsequently replaced with the Occupational Information Network, also known as the O*NET database, last revised in 2010. *See About O*NET, O*NET Resource Center,* https://www.onetcenter.org/overview.html.

heavier physical activities such as patient transfers, guarding ambulatory patients or handling loads" greater than fifty pounds.

Overall, the KCI Report concluded that Grande

demonstrate[d] ability for Medium category work (occasional lift and work up to 50 lbs.) with the above noted job movement demand changes. She demonstrate[d] ability for administrative/supervisory duties, verbal instruction to patients/care givers, assisting physicians with examinations, assisting with wound care/dressing changes, dispensation of medications, pushing wheelchairs, assisting with moderate patient care, handling loads up to 50 lbs., etc.

Shortly after the KCI Report was issued, Briglio contacted KCI via e-mail to clarify several aspects of the Report, including the portions of the job description that Grande could not fulfill and the accommodations she would require.[3] In an addendum, KCI responded that Grande "demonstrates ability for Medium category work (occasional lift and work up to 50 lbs.) with noted job movement demand changes" and reiterated that Grande could return to work with certain accommodations. Nonetheless, the addendum concluded with the following disclaimer: "Please note that determination for final return to work abilities for [Grande] is deferred to her treating physician, in this case, Joel H. Spielman, M.D."

On July 21, 2010, following the functional capacity evaluation, Dr. Spielman re-examined Grande. He provided her with a form that indicated she could return to work the next day with restrictions, "per [the] FCE." Briglio, in turn, advised the hospital that Dr. Spielman "agreed with the FCE report and advised that [Grande] should have permanent restrictions of lifting up to 50 lbs occasionally and that she should transfer patient with assistance only."

The following day, Grande was summoned to a meeting with her supervisors, at which she was fired. Grande testified in her

---

[3] Briglio's e-mail is not in the record before this Court, but KCI's response quotes from her e-mail.

deposition that she was told she had limitations that would prevent her from doing her job.[4]

After her termination, Grande again visited Dr. Spielman, who issued another return-to-work form on August 25, 2010, clearing Grande to return immediately to full-time, full-duty work with no limitations. Grande submitted the new work authorization to Saint Clare's, but Saint Clare's refused to rehire her.

## B.

Nearly a year after her discharge, Grande filed a two-count complaint against Saint Clare's, alleging violations of *N.J.S.A.* 10:5–4.1, a subsection of the LAD. The first count alleged that Saint Clare's unlawfully discriminated against Grande based on her disability, and the second count alleged unlawful discrimination based on a perceived disability.[5]

Saint Clare's denied liability and, following discovery, filed a motion for summary judgment. In a certification supporting that motion, Saint Clare's human resources supervisor, Jordan, asserted that "Grande was physically unable to perform an essential function of her job" and expressed "concern[ ] that Ms. Grande would be re-injured or that a patient would be injured if [Grande] returned to full duty." Jordan also certified that the decision to terminate Grande's employment was based on the findings in the KCI Report and the July 2010 recommendation of Grande's own physician.

---

[4] In Grande's complaint, she alleged that the hospital provided her with a letter confirming her termination and stating that the results of the functional capacity evaluation "indicated specific restrictions" and the hospital was "unable to make accommodations or find a comparable position that w[ould] accommodate [Grande's] medical requirements." A copy of that letter is not in the record before us.

[5] Earlier versions of the LAD used the word "handicap" rather than "disability." *See Victor v. State*, 203 *N.J.* 383, 398 n.3, 4 A.3d 126 (2010). We use the term "disability," except where language is quoted from an opinion or statute.

Grande filed a cross-motion for summary judgment. She conceded that she had periods of disability due to work-related accidents but asserted that she surpassed the D.O.T. weight-lifting requirements for nurses in her field, as reflected on the KCI Report. Grande also alleged that the weight-lifting requirements specified in the KCI Report were "fictitious" because the standards were "far higher" than those required by the D.O.T. and "ha[d] not been shown to have ever been adopted by Saint Clare's." She also contended that the hospital improperly interpreted the KCI Report's recommended lifting restrictions as actual limitations on her abilities, highlighting that she had, in fact, lifted ninety-two pounds from waist to shoulders during the evaluation, far above her employer's fifty-pound requirement.

The trial court granted summary judgment in favor of Saint Clare's, finding that Grande did not establish a prima facie case of discriminatory discharge because she "failed to articulate whether she was performing (or was able to perform) her job at a level that met the employer's legitimate expectations."

A divided Appellate Division panel reversed, vacating summary judgment and remanding because the record contained several material facts in dispute that could only be resolved by a jury. According to the majority, "the motion court incorrectly resolved these materially disputed facts in favor of [Saint Clare's] and rejected or minimized the importance of evidence a rational jury could find to support [Grande's] case of unlawful discrimination due to her perceived physical disability." The majority explained:

Here, plaintiff produced competent evidence, in the form of her treating physician's certification, stating she had been medically cleared to return to work without restrictions. Defendant has not rebutted that medical opinion with the opinion of another physician. Instead, defendant relies on the results of a "functional capacity evaluation [FCE] test" conducted by an alleged independent company retained by defendant's Department of Human Resources. KCI's report contains facially equivocal findings with respect to plaintiff's abilities to perform the core requirements of a nurse.

The dissenting member of the panel emphasized that "[t]he law should not place a hospital in a position of sacrificing employee and patient safety in order to avoid potential liability for discrimi-

nation" and that the hospital "could sensibly rely on [Grande's] actual work history [and history of injuries] when it placed safety interests above [her] continued employment." The dissent also found no genuine factual disputes because "at the time the hospital made its decision to terminate [Grande], her treating physician had stated she could return to work, but only with lifting restrictions"—a recommendation which was modified "only *after* the hospital had already terminated [Grande's] employment."

Saint Clare's filed this appeal as of right pursuant to *Rule* 2:2–1(a)(2), limited to whether summary judgment was appropriately awarded to the hospital by the trial court on the facts in the record before it. We granted amicus curiae status to the New Jersey Association for Justice (NJAJ) and the National Employment Lawyers Association of New Jersey (NELA–NJ).

## II.

### A.

Saint Clare's argues that the LAD, its implementing regulations, and New Jersey employment discrimination jurisprudence authorize Grande's termination. Saint Clare's concedes that Grande is disabled under the LAD but agrees with the trial court that she failed to establish a prima facie case because she could not prove she was performing her job to the hospital's legitimate expectations. Saint Clare's highlights that Grande was working light duty at the time of her discharge, and both the KCI Report and Grande's physician confirmed that she could return to her regular duties only with lifting restrictions.

Even if Grande established a prima facie case, Saint Clare's maintains, the termination of her employment was legal. The hospital cites various provisions of the LAD, including *N.J.S.A.* 10:5–5(q), –2.1, –4.1, and –29.1, which provide that an employer may terminate a disabled employee who, in the reasonable opinion of the employer, is unable to perform adequately her job duties. The hospital also relies on *N.J.A.C.* 13:13–2.8, which allows an

employer to terminate a disabled employee if her continued employment "would be hazardous to the safety or health of such individual, other employees, clients or customers." Saint Clare's maintains that its decision to discharge Grande was appropriate because, unlike the employer's improper reliance on a deficient medical report in *Jansen v. Food Circus Supermkts., Inc.*, 110 *N.J.* 363, 541 *A.*2d 682 (1988), Saint Clare's decision was based on objective evidence—the functional capacity evaluation—as well as Grande's own undisputed history of injuries on the job.

## B.

Grande contends that Saint Clare's admission—that it fired her because of her perceived disability—is direct evidence of discrimination and, thus, *Jansen* does not require her to prove a prima facie case. Instead, Grande maintains that the burden rests on Saint Clare's to assert an affirmative defense, which the hospital failed to do by competent medical or scientific evidence. Grande argues that because Saint Clare's failed to follow up with her treating doctor, there is no competent evidence that she was a risk to herself or patients or that she could not perform her job duties.

Finally, Grande claims that certain factual issues remain in dispute, including (1) the applicability of Saint Clare's purported lifting requirements to R.N.s in Grande's position; (2) the number of injuries she sustained; (3) whether she would need assistance handling loads over fifty pounds; and (4) that she is likely to suffer future injury.

## C.

Amici NJAJ and NELA–NJ agree with both parties that *Jansen* provides the controlling test on disability discrimination under the LAD. NJAJ asserts that Saint Clare's made the same error here as the employer in *Jansen*—it improperly assumed that there was a probability of future injury without relying on an expert report linking Grande's perceived disability to a probability of substantial harm.

NELA–NJ adds that because Grande presented direct evidence of discrimination, the only issue is "whether Saint Clare's met its burden of proving 'it would have made the same decision even in the absence of the impermissible consideration'" (quoting *Bergen Commercial Bank v. Sisler*, 157 *N.J.* 188, 209, 723 *A.*2d 944 (1999)). NELA–NJ also cautions that Saint Clare's should not be given "carte blanche" to decide what the essential functions of a particular job are, as this would allow an employer to "invent unrealistic job requirements for the sole purpose of eliminating disabled people from consideration." It urges that the proper approach is to allow a fact-finder to weigh the employer's statements, the written job description, the work experience of current and former employees, and other factors, such as the D.O.T. standards, to determine whether the employer's criteria are realistic or designed to discriminate against a disabled person.

### III.

Turning to the law relevant to the parties' arguments, the LAD prohibits an employer from terminating a disabled employee because of her disability unless the disability "reasonably precludes the performance of the particular employment." *N.J.S.A.* 10:5–4.1. The law governing an action "seeking redress for an alleged violation of the LAD" depends upon whether the employee "'attempt[s] to prove employment discrimination by ... direct or circumstantial evidence.'" *Smith v. Millville Rescue Squad*, 225 *N.J.* 373, 394, 139 *A.*3d 1 (2016) (quoting *Sisler, supra*, 157 *N.J.* at 208, 723 *A.*2d 944). Plaintiffs are permitted to prove their claim using either or both methods. *Sisler, supra*, 157 *N.J.* at 208, 723 *A.*2d 944.

### A.

To prove a discriminatory discharge case by direct evidence, a plaintiff "must produce evidence 'that an employer placed substantial reliance on a proscribed discriminatory factor in making its decision'" to terminate the employee. *Smith, supra*, 225

*N.J.* at 394, 139 *A*.3d 1 (quoting *A.D.P. v. ExxonMobil Research & Eng'g Co.*, 428 *N.J.Super.* 518, 533, 54 *A*.3d 813 (App. Div. 2012)). "The evidence produced must, if true, demonstrate not only a hostility toward members of the employee's class, but also a direct causal connection between that hostility and the challenged employment decision." *Sisler, supra,* 157 *N.J.* at 208, 723 *A*.2d 944 (citing *Price Waterhouse v. Hopkins*, 490 *U.S.* 228, 277, 109 *S.Ct.* 1775, 1804, 104 *L.Ed.*2d 268, 305 (1989) (O'Connor, J., concurring)).

■ "After the plaintiff sets forth 'direct evidence of discriminatory animus, the employer must then produce evidence sufficient to show that it would have made the same decision if illegal bias had played no role in the employment decision.'" *Smith, supra,* 225 *N.J.* at 395, 139 *A*.3d 1 (quoting *Fleming v. Corr. Healthcare Sols.*, 164 *N.J.* 90, 100, 751 *A*.2d 1035 (2000)).

### B.

If direct evidence of discrimination is unavailable, a plaintiff may prove her claim by circumstantial evidence. To evaluate circumstantial evidence cases, this Court has adopted the three-step burden-shifting test articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 *U.S.* 792, 93 *S.Ct.* 1817, 36 *L.Ed.*2d 668 (1973). *Andersen v. Exxon Co., U.S.A.*, 89 *N.J.* 483, 492–93, 446 *A*.2d 486 (1982). Nevertheless, this Court has modified the *McDonnell Douglas* framework in evaluating disability discrimination claims. *See id.* at 498, 446 *A*.2d 486 (noting that, in "physical handicap" cases, "it will not be necessary to go through all of the strict steps of the *McDonnell Douglas* formula").

### 1.

■ The first step of our modified framework requires that a plaintiff establish a prima facie case. *Jansen, supra,* 110 *N.J.* at 382, 541 *A*.2d 682. When a plaintiff alleges she was fired discriminatorily based on a disability, she must prove by a preponderance

of the evidence that: (1) she is disabled within the meaning of the LAD; (2) she "was performing [her] job at a level that met [her] employer's legitimate expectations"; (3) she was discharged; and (4) the employer sought someone else to perform the same work after she left. *Ibid.* (quoting *Clowes v. Terminix Int'l, Inc.*, 109 *N.J.* 575, 597, 538 *A.*2d 794 (1988)).

As to the first prong of the prima facie case, an employee who is perceived to have a disability is protected just as someone who actually has a disability. *Victor v. State*, 203 *N.J.* 383, 410, 4 *A.*3d 126 (2010); *Rogers v. Campbell Foundry, Co.*, 185 *N.J.Super.* 109, 112–13, 447 *A.*2d 589 (App. Div.), *certif. denied*, 91 *N.J.* 529, 453 *A.*2d 852 (1982).

The second prong—whether the employee is able to perform at a level that meets "legitimate or reasonable expectations"—is to be evaluated by an objective standard. *Viscik v. Fowler Equip. Co.*, 173 *N.J.* 1, 21, 800 *A.*2d 826 (2002). Thus, deficiencies in an employee's performance are reserved for consideration at later stages in the analysis. *Ibid.* For the second prong, "[a]ll that is necessary is that the plaintiff produce evidence showing that she was actually performing the job prior to termination." *Zive v. Stanley Roberts, Inc.*, 182 *N.J.* 436, 454, 867 *A.*2d 1133 (2005).

The fourth prong requires proof that the "employer sought a replacement with qualifications similar to [the employee's] own, thus demonstrating a continued need for the same services and skills." *Sisler, supra*, 157 *N.J.* at 218–19, 723 *A.*2d 944 (emphasis omitted) (quoting *Erickson v. Marsh & McLennan Co.*, 117 *N.J.* 539, 553, 569 *A.*2d 793 (1990)).

2.

If a plaintiff successfully establishes a prima facie case, "a presumption arises that the employer unlawfully discriminated against the plaintiff." *Clowes, supra*, 109 *N.J.* at 596, 538 *A.*2d 794. The analysis then proceeds to the second step of the test, where

"the employer's burden varies depending on whether the employer seeks to establish the reasonableness of the otherwise discriminatory act or advances a non-discriminatory reason for the employee's discharge." *Jansen, supra,* 110 *N.J.* at 382, 541 *A.*2d 682.

If the employer claims that it has a non-discriminatory reason for the discharge, "the burden of production—not the burden of proof or persuasion—shifts to the employer." *Ibid.* The employee may respond by proving by a preponderance of the evidence that the reason proffered by the employer "was not the true reason for the employment decision but was merely a pretext for discrimination." *Id.* at 382–83, 541 *A.*2d 682 (quoting *Andersen, supra,* 89 *N.J.* at 493, 446 *A.*2d 486). As with the traditional *McDonnell Douglas* framework, the burden of proving that the employer intentionally discriminated remains at all times with the employee. *Id.* at 383, 541 *A.*2d 682.

If, in the second step, "the employer defends by asserting that it reasonably concluded that the handicap prevented the employee from working," the employer bears the burden of proof as to its defense, and not a mere burden of production. *Id.* at 383, 541 *A.*2d 682; *see N.J.A.C.* 13:13–2.8(a)(3); *see also N.J.S.A.* 10:5–29.1 (stating that "[u]nless it can be clearly shown that a person's disability would prevent [her] from performing a particular job, it is an unlawful employment practice to deny an otherwise qualified person with a disability the opportunity to ... maintain employment"). To carry its burden, the employer must prove "it ... reasonably arrived at its opinion that the [employee] is unqualified for the job." *Andersen, supra,* 89 *N.J.* at 496, 446 *A.*2d 486. The employer must produce evidence that its decision was based on "an objective standard supported by factual evidence" and not on general assumptions about the employee's disability. *N.J.A.C.* 13:13–2.8(a)(3).

One possible basis for the employer's affirmative defense is safety. Recognizing the importance of safety in the workplace, the LAD regulations and this Court have made clear

that an employer may terminate a disabled employee where continued employment "would be hazardous to the safety or health of [the employee], other employees, clients or customers." *N.J.A.C.* 13:13–2.8(a)(2); *Jansen, supra,* 110 *N.J.* at 374, 541 *A.2d* 682. "When asserting [that] safety defense, the employer must establish with a reasonable degree of certainty that it reasonably arrived at the opinion that the employee's handicap presented a materially enhanced risk of substantial harm in the workplace." *Jansen, supra,* 110 *N.J.* at 383, 541 *A.2d* 682. Importantly, "[a]n employer may not base a decision to discharge an employee for safety reasons on subjective evaluations or conclusory medical reports." *Greenwood v. State Police Training Ctr.,* 127 *N.J.* 500, 511, 606 *A.2d* 336 (1992).

## C.

In addition to the above analysis, the LAD regulations require an evaluation of whether a reasonable accommodation would have allowed the disabled employee to perform her job. The Administrative Code mandates that an employer "consider the possibility of reasonable accommodation before firing, demoting or refusing to hire or promote a person with a disability on the grounds that his or her disability precludes job performance." *N.J.A.C.* 13:13–2.5(b)(2); *see also Viscik, supra,* 173 *N.J.* at 19–20, 800 *A.2d* 826 (noting that reasonable accommodation arises as issue in disability discrimination cases in two instances: where plaintiff affirmatively pleads failure to accommodate and where employer defends on grounds that employee was terminated due to inability to perform job).

We have yet to determine, outside of a failure-to-accommodate claim, at what point in the *McDonnell Douglas* analysis a court is to consider the availability of a reasonable accommodation. In discriminatory discharge cases, the Appellate Division has addressed reasonable accommodations in its analysis of the second prong of a plaintiff's prima facie case, where the employee must produce evidence that she was performing her job to her employ-

er's expectations. *See, e.g., Svarnas v. AT&T Commc'ns,* 326 *N.J.Super.* 59, 74–81, 740 *A.*2d 662 (App. Div. 1999) (discussing whether reasonable accommodation would have allowed chronically absent employee to perform essential job requirements). That approach is consistent with the evaluation of discriminatory discharge claims under the Americans with Disabilities Act (ADA), 42 *U.S.C.A.* §§ 12101 to 12213. *See, e.g., Taylor v. Phoenixville Sch. Dist.,* 184 *F.*3d 296, 306 (3d Cir. 1999) (plaintiff alleging discriminatory discharge under ADA must establish, as second prong of prima facie case, that she "is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer" (quoting *Gaul v. Lucent Techs.,* 134 *F.*3d 576, 580 (3d Cir. 1998))).

In assessing "allegations of unlawful discrimination, this Court has looked to federal law as a key source of interpretive authority." *Grigoletti v. Ortho Pharm. Corp.,* 118 *N.J.* 89, 97, 570 *A.*2d 903 (1990). Moreover, our courts have evaluated an employer's obligation to reasonably accommodate an employee's disability under the LAD in accordance with the ADA. *Royster v. N.J. State Police,* 227 *N.J.* 482, 499, 152 *A.*3d 900 (2017).

Accordingly, we hold that the reasonable-accommodation consideration belongs in the second-prong analysis. A plaintiff may satisfy the second prong of the prima facie case for an allegation of discriminatory discharge based on a disability by putting forth evidence either that she was actually performing her job or was able, with or without reasonable accommodation, to perform her job to her employer's legitimate expectations.

An employer may rebut a plaintiff's reasonable-accommodation showing by providing evidence that the proposed accommodation is unreasonable. *See N.J.A.C.* 13:13–2.5(b); –2.5(b)(3)(i) to (iv).[6] As we recognized in *Andersen, supra,* where "the job

---

[6] In *Raspa v. Office of Sheriff of Cty. of Gloucester,* the plaintiff conceded that his medical limitation—degenerating eyesight—rendered him "unable to per-

qualifications [are] virtually a mirror reflection of the physical boundaries of the [employee's] handicap," proof by the employee that she could perform the job with or without a reasonable accommodation is "tantamount to proving" that the disability does not hinder the employee's job performance. 89 *N.J.* at 499 n.5, 446 *A.*2d 486.

### IV.

■ Before turning to the proofs necessary to establish Grande's LAD claim, we must first determine whether this is a case of direct or circumstantial evidence. We note that the Appellate Division did not directly address this question, but the majority opinion references *Jansen*, indicating that, like the trial court, it was applying the *McDonnell Douglas* circumstantial evidence framework to Grande's claim.

The parties contend that this is a direct evidence case because Saint Clare's admits that Grande's disability motivated its decision to terminate her. We disagree. Saint Clare's concedes that Grande is disabled under the LAD and admits that it fired her because her perceived disability precluded her from performing as a R.N. Nonetheless, Grande has produced no evidence of discriminatory

---

form any of the essential functions" of his position as a corrections officer, and the evidence showed "no objectively viable and reasonable accommodation would ever make" the plaintiff qualified to perform those essential functions. 191 *N.J.* 323, 328, 338, 924 *A.*2d 435 (2007). This Court held that "an employee must possess the bona fide occupational qualifications for the job position that employee seeks to occupy in order to trigger an employer's obligation to reasonably accommodate the employee." *Id.* at 327, 924 *A.*2d 435. The Court also held that "the LAD does not require that an employer create an indefinite light duty position for a permanently disabled employee if the employee's disability, absent a reasonable accommodation, renders him otherwise unqualified for a full-time, full-duty position." *Id.* at 340, 924 *A.*2d 435. We conclude that *Raspa* stands for the proposition that an employer is not required to accommodate a disabled employee by creating a permanent, light-duty position. In a wrongful discharge case, an employee may nonetheless show in her prima facie case that an accommodation other than the creation of a new, light-duty position would allow her to perform her job to her employer's legitimate expectations.

animus toward disabled employees. She alleges that the lifting standards identified in the KCI Report and the 2008 Job Analysis do not reflect the actual requirements of her job. Grande has not shown, however, that those requirements apply only to R.N.s with disabilities or are otherwise entirely unrelated to the performance of a R.N.'s duties. *See A.D.P.*, *supra*, 428 *N.J.Super.* at 534–35, 54 *A.*3d 813 (finding direct evidence of discrimination when employer's policy applied only to employees identified as alcoholics and employee's discharge, based on noncompliance with policy, was unrelated to job performance).

We acknowledge that, in LAD claims alleging discrimination based on other protected classes, such as race, sex, national origin, or marital status, an employer's admission that a protected characteristic motivated its employment decision would be direct evidence of discrimination. *See, e.g.*, *Smith*, *supra*, 225 *N.J.* at 397–99, 139 *A.*3d 1 (finding direct evidence of marital status discrimination when employer stated that employee would not have been fired if he had reconciled with his wife). However, the LAD provides that an employer may lawfully terminate a disabled employee if the disability precludes job performance. *N.J.S.A.* 10:5–4.1. Therefore, more than Saint Clare's admission is needed to establish direct evidence of discrimination here; evidence of animus or hostility toward the disabled must also be produced. Because Grande fails to show a "hostility toward members of [her] class," *Sisler*, *supra*, 157 *N.J.* at 208, 723 *A.*2d 944, we agree with the Appellate Division that this case must be resolved by applying the *McDonnell Douglas* circumstantial evidence framework.

## V.

Having concluded that this is a circumstantial evidence case, we apply the *McDonnell Douglas* framework to determine the proofs necessary to establish Grande's LAD claim and whether summary judgment was appropriately granted in Saint Clare's favor. We review Saint Clare's motion for summary judgment using the same standard applied by the trial court—whether, after

reviewing "the competent evidential materials submitted by the parties" in the light most favorable to Grande, "there are genuine issues of material fact and, if not, whether the moving party is entitled to summary judgment as a matter of law." *Bhagat v. Bhagat*, 217 *N.J.* 22, 38, 84 *A.*3d 583 (2014) (citing *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995)). An issue of material fact is "genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." *Ibid.* (quoting *R.* 4:46–2(c)).

### A.

■ We first consider Saint Clare's argument that it was entitled to summary judgment because Grande failed to state a prima facie case. Once again, under our modified *McDonnell Douglas* analysis, Grande must establish a prima facie case by putting forth evidence that: (1) she is disabled within the meaning of the LAD; (2) she was actually performing her job or was able, with or without reasonable accommodation, to perform her job at a level that met Saint Clare's legitimate expectations; (3) she was discharged; and (4) Saint Clare's sought someone else to perform the same work after she left. *See Jansen, supra*, 110 *N.J.* at 382, 541 *A.*2d 682.

It is undisputed that Saint Clare's perceived Grande as disabled and terminated her from her R.N. position. Further, neither party claims that whether Saint Clare's filled or eliminated Grande's nursing position is pertinent to the summary judgment motion under consideration. Therefore, only the second prong remains at issue.

Saint Clare's argues that Grande failed to satisfy that second prong because her lengthy absences are proof that she was not performing her job. *Cf. Svarnas, supra*, 326 *N.J.Super.* at 77, 740 *A.*2d 662 (stating that employer is not required to accommodate "chronic and excessive absenteeism"). Although Grande worked

for Saint Clare's for ten years and was never warned that her job was at risk, she was absent for over twelve months due to her injuries, worked about two months on light-duty assignments, and was on light duty, concededly at the hospital's request, at the time she was fired.

Grande argues that she made a showing sufficient to withstand summary judgment under the second prong by putting forth evidence that she was employed for ten years and her performance was "exemplary." She relies on *Zive, supra,* where this Court stated that the "slight burden of the second prong is satisfied" when a plaintiff "adduces evidence that [s]he has, in fact, performed in the position up to the time of termination." 182 *N.J.* at 455, 867 *A.*2d 1133. Grande further claims that, at the time of her termination, she was able to resume full-time, full-duty work, and her periods of absence, in light of her ten-year history with the hospital, did not keep her from satisfying her prima facie case.

In *Zive,* the employee suffered a stroke, after which he did not take time off from work but instead worked from home for three months while recovering. *Id.* at 442–43, 867 *A.*2d 1133. When the employee wished to return to work at the company, he was told that his services would no longer be required. *Id.* at 443, 867 *A.*2d 1133. The employer defended its decision to terminate the employee by claiming that he failed to meet an unusually high sales goal. *Id.* at 450–51, 867 *A.*2d 1133. This Court was not persuaded, reasoning that the employee had extensive experience in his field, had worked for his employer for eight years, had been actively engaged in management and administration, and had never been told that his job was at stake. *Id.* at 456, 867 *A.*2d 1133. Importantly, *Zive* did not address the employer's obligation to consider reasonable accommodations prior to terminating a disabled employee, as required by the LAD regulations. *See N.J.A.C.* 13:13–2.5(b)(2). *Zive,* thus, did not involve an employee's extended periods of absence from work and did not address the required reasonable-accommodation consideration.

We nevertheless agree with Grande that the modest burden to withstand summary judgment as to the second prong of the prima facie case has been met. An issue of fact exists as to whether Grande's periods of absence from work were sufficiently "chronic and excessive," *Svarnas, supra,* 326 *N.J.Super.* at 77, 740 *A.*2d 662, to preclude her from demonstrating that she was actually performing her job at the time she was terminated. While this factual dispute is material to Grande's prima facie case, we express no opinion on the issue.

We additionally note that, as the parties acknowledged in oral argument, the record is rather undeveloped as to any reasonable accommodation that would allow Grande to perform the essential functions of her job despite her disability. While the record is silent as to specifics, it does indicate that Saint Clare's considered accommodations that could potentially allow Grande to continue her employment, but that no reasonable accommodation existed. Grande maintains that she needed no accommodation. Therefore, we see no reason to allow additional discovery to develop the record in this regard, and we remand for trial on the record as it stands.

## B.

Having concluded that factual disputes exist as to Grande's prima facie case, we now turn to Saint Clare's alternate claim that, even if Grande has established a prima facie case, Saint Clare's is entitled to summary judgment on the basis of the defenses it asserted under the second *McDonnell Douglas* step.

Saint Clare's admits that it fired Grande because of her disability but claims that the firing was justified because Grande was both unable to perform the essential functions of her job and unable to do so without posing a risk of harm to herself or others. The hospital bears the burden of proof as to its defenses. *Jansen, supra,* 110 *N.J.* at 383, 541 *A.*2d 682.

1.

■ To prove its claim that Grande's perceived disability precluded her from performing as a R.N., Saint Clare's must show that "it reasonably arrived at [its] opinion." *Andersen, supra,* 89 *N.J.* at 499–500, 446 *A.*2d 486. That is, Saint Clare's must demonstrate that its opinion is "based upon an objective standard supported by factual evidence"; general assumptions about Grande's disability are insufficient. *N.J.A.C.* 13:13–2.8(a)(1).

Saint Clare's maintains that it met this burden by relying on the KCI Report, which is more comprehensive than the cursory medical examination we found insufficient in *Andersen, supra,* 89 *N.J.* at 500, 446 *A.*2d 486. In *Andersen,* an applicant sought a position as a truck driver and underwent a "preplacement physical examination." *Id.* at 489, 446 *A.*2d 486. The applicant disclosed to the examining doctor that he had had back surgery thirteen years prior. *Ibid.* The doctor performed a cursory physical evaluation and asked the applicant only to "raise his hands and bend over and touch his toes." *Ibid.* The doctor then concluded that the applicant was unfit for the job because "people with back problems would not be hired." *Ibid.* This Court held that such a deficient medical report was an insufficient basis on which the employer could reasonably arrive at its opinion that the applicant's disability precluded job performance. *Id.* at 500, 446 *A.*2d 486.

While we acknowledge that the KCI Report here is more than a cursory evaluation, we find it presents material issues of fact that could not be resolved on the record before the trial court. First, there is a dispute as to whether the lifting standards identified by the KCI Report as Saint Clare's requirements are actually the standards applicable to Grande's position. Saint Clare's 2008 Job Analysis indicates that R.N.s are required, as essential functions of their job, to lift fifty pounds from waist to chest frequently (34% to 66% of the day) and several other loads occasionally (1% to 33% of the day), including twenty-five pounds from floor to waist, ten pounds from chest to overhead, twenty pounds in a two-hand carry, and ten pounds in a one-hand carry. The Job Analysis does

not identify any activity that is performed at a frequency greater than 66% of the day.

The KCI Report, on the other hand, lists the following as the hospital's requirements: constantly (67% to 100% of the day) lift twenty pounds, frequently lift fifty pounds, and occasionally lift 100 pounds. The addendum to the KCI Report indicates that the Report's standards were based on a job description provided by the hospital but does not confirm whether that job description is the 2008 Job Analysis. The record is also silent as to why the KCI standards differ from those listed on the Job Analysis. Grande contends that the standards on neither the KCI Report nor the Job Analysis reflect what she actually does in her position. Thus, from the record before us, we cannot discern which tasks were essential to Grande's job.

Second, there is a dispute as to whether the KCI Report conclusively establishes that Grande is unable to perform her job. The Report indicates that, in some categories, Grande's ability was below the hospital's standards. The Report also states, however, that while the results "may be compatible with mild residual functional issues," "[i]t is improbable that this will significantly affect job performance ability." The addendum to the report makes clear that "determination for final return to work abilities ... is deferred to [Grande's] treating physician." Dr. Spielman had cleared Grande to return to full-time, full-duty work on July 8, 2010, four days before the FCE was performed. Although Dr. Spielman subsequently restricted Grande's work pursuant to the FCE, Grande disputes that such restrictions were permanent.[7] The hospital claims that Dr. Spielman recommended permanent lifting restrictions; Grande alleges Dr. Spielman told her she could resume her regular duties; and the KCI Report does not

---

[7] Because the August 2010 return-to-work certificate issued by Grande's doctor clearing her to return to full-time, full-duty work with no limitations postdated her discharge by Saint Clare's, it is not relevant to our determination.

indicate whether its recommendations were permanent or temporary.

These factual disputes are material to the issue of whether Grande's disability precluded her from performing the essential functions of her job.

2.

 Saint Clare's also maintains that Grande's history of injuring herself on the job sufficiently proved her inability to perform her job without posing a risk of harm to herself or others.

To assert this defense, Saint Clare's "must establish with a reasonable degree of certainty that it reasonably arrived at the opinion that [Grande's] handicap presented a materially enhanced risk of substantial harm in the workplace." *Jansen, supra,* 110 *N.J.* at 383, 541 *A.*2d 682. The New Jersey Administrative Code explains the employer's burden as follows:

> Refusal to select a person with a disability may be lawful where it can be demonstrated that the employment of that individual in a particular position would be hazardous to the safety or health of such individual, other employees, clients or customers where hazard cannot be eliminated or reduced by reasonable accommodation. Such a decision must be based upon an objective standard supported by factual or scientifically validated evidence, rather than on the basis of general assumptions that a particular disability would create a hazard to the safety or health of such individual, other employees, clients or customers. A "hazard" to the person with a disability is a materially enhanced risk of serious harm.
>
> [*N.J.A.C.* 13:13–2.8(a)(2) (emphases added).]

Thus, the Administrative Code requires that an employer base its conclusion to terminate an employee on "factual or scientifically validated evidence." *Ibid.*

Here, viewing the facts in the light most favorable to Grande, she sustained at least three disabling injuries for which she was required to be absent from work. After each of the first two injuries, however, she was cleared to return to work and did so. After the final injury, Grande's physician also cleared her to return to regular duty prior to her termination.

There is no indication in the record that plaintiff caused injury to the patients in the course of incurring her own injuries. Moreover, the KCI Report only recommends that Grande be assisted in attempting to lift more than fifty pounds, even though she was able to lift much heavier loads during testing. The Report says nothing about Grande's ability to otherwise perform her job without causing injury to patients or to herself.

Furthermore, there is no expert testimony that Grande's perceived susceptibility to injury posed a "materially enhanced risk of serious harm" to herself or her patients. *N.J.A.C.* 13:13–2.8(a)(2); *accord Jansen, supra,* 110 *N.J.* at 374–75, 541 *A.*2d 682. We conclude, therefore, that the evidence that Grande presented a risk of injury to herself or patients is inadequate to resolve conclusively this material issue.

In affirming the requirements set forth in *Jansen,* we remain cognizant of the need for safe work environments. Our holding today is not intended to limit an employer's ability to promulgate safety standards or to require of its employees the physical ability to safely perform their duties. Nonetheless, when terminating a disabled employee because of an inability to abide by such standards, an employer must prove that its standards relate to the employee's duties and that no reasonable accommodation exists that will allow the employee to continue in her position.

VI.

For the reasons set forth above, the judgment of the Appellate Division is affirmed as modified, and the matter is remanded to the trial court for further proceedings.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ–VINA, and TIMPONE join in JUSTICE SOLOMON's opinion. JUSTICE LaVECCHIA filed a separate, CONCURRING opinion.

JUSTICE LaVECCHIA concurring.

I concur in the majority opinion remanding this disability discrimination matter for trial. I agree that plaintiff has met her pretrial obligation to present a prima facie case of unlawful discrimination under our Law Against Discrimination (LAD), *N.J.S.A.* 10:5-1 to -42, entitling her to a determination by a jury of the material factual disputes between the parties. However, I write separately to address two matters.

First, I write to underscore that, in order for a disability discrimination claim to survive a summary judgment motion, the showing required of a terminated plaintiff regarding her ability to perform the essential functions of her job is a modest one. Although this matter involves a number of disputes as to plaintiff's job requirements and defendant's justification for terminating her, such disputes do not deprive plaintiff of her opportunity to have the matter heard by a jury. And, plaintiff's pretrial showing certainly should not require her to resolve issues that more properly belong in the employer's required presentation. Second, I write to observe that this matter is a missed opportunity to reassess the convoluted frameworks we have adopted to evaluate LAD disability discrimination cases. To the extent those frameworks apply, I also agree with the parties that this matter would be better and more effectively analyzed as a direct evidence case.

I.

All parties agree that *Jansen v. Food Circus Supermarkets, Inc.*, 110 *N.J.* 363, 541 *A.*2d 682 (1988)—our preeminent decision on the subject of disability discrimination—provides the starting point for analysis in this matter. In effectuating our LAD's charge regarding disability discrimination, this Court in *Jansen, supra,* initially turned to the *McDonnell Douglas* [1] test, as it had for other claims involving allegations of "discrimination in hiring

---

[1] *McDonnell Douglas Corp. v. Green,* 411 *U.S.* 792, 93 *S.Ct.* 1817, 36 *L.Ed.*2d 668 (1973).

because of race, creed, color, national origin, ancestry, age, marital status, or sex." 110 *N.J.* at 380, 541 *A.2d* 682. After reciting the *McDonnell Douglas* framework, the *Jansen* Court observed that in the disability discrimination context, the employer often admits that it subjected an employee to disparate treatment because of a disability, "but claims that [the treatment] was justified." *Id.* at 381, 541 *A.2d* 682 (quoting *Andersen v. Exxon Co.*, 89 *N.J.* 483, 498, 446 *A.2d* 486 (1982)).

The Court stated that when the employer makes such an admission, "fairness suggests that the employer bear the burden of persuasion that 'the nature and extent of the handicap reasonably precludes the performance of the particular employment.'" *Ibid.* (quoting *N.J.S.A.* 10:5–4.1 (1988)).[2] Accordingly, the Court placed that burden on the employer because it recognized that the employer "is in a better position to prove that it reasonably arrived at the conclusion that the handicap precluded employment." *Ibid.* That burden-of-proof obligation was viewed as consistent with the statutory direction in *N.J.S.A.* 10:5–4.1 and the LAD's implementing regulation, *N.J.A.C.* 13:13–2.8.

The Court recognized both the strong public policy underlying the LAD's protection of disabled employees and the countervailing interest of employers in the ability to fire or refuse to hire employees who cannot safely perform a job. *Jansen, supra,* 110 *N.J.* at 374, 541 *A.2d* 682. To balance those interests in *Jansen*—a case involving an employee with epilepsy—the Court stated that "[t]he appropriate test is not whether the employee suffers from epilepsy or whether he or she may experience a seizure on the job, but whether the continued employment of the employee in his or her present position poses a reasonable probability of substantial harm." *Id.* at 374–75, 541 *A.2d* 682. The Court determined that the trial and appellate courts had erred by equating the future proba-

---

[2] *Jansen* quotes a prior version of the statute, which has been amended to refer to whether "the nature and extent of the disability reasonably precludes the performance of the particular employment." *L.* 2003, *c.* 180 (codified at *N.J.S.A.* 10:5–4.1).

bility of a seizure on the job with the future probability of injury, when Jansen's employer had made no showing that Jansen's seizures posed a risk of injury to himself or others. *Id.* at 377, 541 A.2d 682 ("The assumption that every epileptic who suffers a seizure is a danger ... reflects the prejudice that the [LAD] seeks to prevent."). The Court explained that the employer had not "reasonably arrived at" its decision to fire Jansen because the employer relied on a deficient medical report, which did not distinguish between the probability of future seizures and actual risk of harm, and did not consider Jansen's work history or his own doctors' reports. *Id.* at 379–80, 541 A.2d 682.

The *Jansen* Court reiterated that, as part of a prima facie case, a plaintiff must establish: (1) that he was disabled within the meaning of the LAD, "(2) that he was performing his job at a level that met his employer's legitimate expectations, (3) that he nevertheless was fired, and (4) that the [employer] sought someone to perform the same work after he left." *Id.* at 382, 541 A.2d 682 (alteration in original) (quoting *Clowes v. Terminix Int'l, Inc.*, 109 N.J. 575, 597, 538 A.2d 794 (1988)). However, the *Jansen* Court did not dwell on whether Jansen had presented a prima facie case because the issue in dispute focused on the affirmative safety defense advanced by Jansen's employer.[3] The Court held that where an employer defends its disparate treatment of a disabled employee by raising a safety defense, the employer bears the burden of proof to show that its conclusion that the employee

---

[3] The *Jansen* Court briefly referred to the second prong of a prima facie case, respecting an employee's ability to perform a job, noting that "[i]n some cases, ... the handicap is so directly related to the job qualifications that the applicant's proof of his or her physical ability to do the job is tantamount to proof that the handicap would not hinder his or her performance." *Id.* at 382, 541 A.2d 682. However, the Court also noted that the employer is in the best position to put forward facts relating to the qualifications for a position with respect to a safety defense, *id.* at 381, 541 A.2d 682, suggesting that, should the nexus between a disability and job qualifications be in dispute, the employer would bear the burden of persuading the factfinder of the necessity of imposing those qualifications.

could not perform the job was a reasonable one. *Id.* at 383, 541 *A.*2d 682.

*Zive v. Stanley Roberts, Inc.,* 182 *N.J.* 436, 451–56, 867 *A.*2d 1133 (2005), focused on the second prong of *McDonnell Douglas* and assessed the quantum of proof required to be produced by a plaintiff when presenting a prima facie case of disability discrimination. In *Zive,* we expressly kept the plaintiff's burden as to the second prong "slight" when a plaintiff had been performing the job prior to being terminated based on perceived disability. 182 *N.J.* at 455, 867 *A.*2d 1133. We instructed courts not to consider the employer's evidence disputing job performance related to the essentials of one's job in the context of the plaintiff's pretrial prima facie case. *Ibid.*

The majority recognizes that there are disputed facts about plaintiff's essential job functions and whether she can perform them. I agree that those issues must be resolved by a jury, and therefore I concur in this judgment. That said, *Jansen* and *Zive* provide all the guidance necessary to understand the standards governing plaintiff's pretrial prima facie case, and plaintiff has met those standards. The majority differentiates this case from *Zive,* asserting that *Zive* did not address reasonable accommodation or an employee's extended absence from work prior to seeking return from a workers' compensation leave due to a work injury.

In my view, issues of reasonable accommodation or absenteeism due to disability have no business being compressed into plaintiff's pretrial prima facie case. Because plaintiff did not plead a failure to accommodate claim, reasonable accommodation was not at issue as part of plaintiff's pretrial case. As for absenteeism, Saint Clare's did not rely on plaintiff's absences as a reason for terminating her employment. Courts faced with disability discrimination claims should remain focused pretrial on the key question of whether there are triable issues of fact on which a jury could base a finding that an employer has unlawfully discriminated against an employee.

## II.

*Jansen* insightfully instructed that if an employer wants to assert safety as its justification for terminating an employee, it must bear the burden of persuasion on that point. Although the context is different, the facts of this case are similar to the facts of *Jansen*. Like in *Jansen*, in this case an employer has terminated an employee, admittedly on the basis of a physical disability. This case is also like *Jansen* in that there has been no expert report produced for trial that clearly addresses the probability of future harm due to the asserted disability. Under *Jansen, supra*, the question to be addressed is whether Saint Clare's has established "with a reasonable degree of certainty that it reasonably arrived at the opinion that the employee's handicap presented a materially enhanced risk of substantial harm in the workplace." 110 *N.J.* at 383, 541 *A.*2d 682.

As in *Jansen*, the elements of an employee's pretrial prima facie case to prove discriminatory intent are not the center of this dispute because Saint Clare's has admitted that it terminated Grande based on her disability. And, under *Zive*, plaintiff has adduced some proof that she was capable of performing her job. While Saint Clare's asserts that lifting is an essential function of plaintiff's job as a registered nurse and that plaintiff did not demonstrate during her KCI examination that she met the employer's lifting standards, those facts are heavily disputed. Consistent with the regulations implementing the LAD, Saint Clare's bears the ultimate burden of demonstrating that "as a result of [plaintiff's] disability, [she] cannot perform the essential functions of the job even with reasonable accommodation." *N.J.A.C.* 13:13-2.8; *see also N.J.S.A.* 10:5-29.1 (requiring clear showing of employee's inability to perform job).

To the extent that Saint Clare's is asserting a safety defense, it also bears the burden of proof on that defense. Plaintiff will be required to rebut Saint Clare's proofs on that defense before the factfinder, once the groundwork for a safety defense has been

established. She has already proffered evidence of her differing view of the facts about the job and her ability to perform it.

So, in this case, there are material factual disputes regarding whether plaintiff has demonstrated her objective ability to do the job—with or without reasonable accommodation, as the majority adds—according to legitimate job standards. Those factual issues to be resolved are distinct from the employer's claimed safety concerns. Still, *N.J.S.A.* 10:5-29.1 requires that "[u]nless it can be *clearly shown* that a person's disability would prevent [her] from performing a particular job, it is an unlawful employment practice to deny to an otherwise qualified person with a disability the opportunity to ... maintain employment" (emphasis added). Thus, at trial, Saint Clare's must bear the burden as to whether its conclusion that plaintiff could not perform her job was reasonably arrived at, in addition to the burden as to its safety defense.

In other words, whether plaintiff's termination was "justified by lawful considerations" remains to be decided at trial. There has been no concession here by plaintiff that she cannot do the job. There is a dispute over the "essential functions" of the job.[4] There is a factual dispute over whether the KCI Report contains sufficient proof that plaintiff cannot perform essential lifting duties of the job, even assuming the asserted essential lifting requirements are legitimate. And, the factual questions about the disputed standards are complicated by the apparent lack of historical evidence that this employer subjected its nursing force to strength

---

[4] Grande's job description does not mention lifting in the summary. The list of essential requirements for the job contains "Lift and Carry Tasks," which list the amount of weight a nurse must be required to lift or carry. There is no mention of frequency and no mention that heavy lifting must be done regularly. The U.S. Department of Labor's Dictionary of Occupational Titles (D.O.T.), to which the KCI Report refers, lists nursing as a "medium" strength demand job, which requires the employee to occasionally lift fifty pounds and frequently lift twenty pounds. A point of disagreement between the parties arises from comparing Grande's actual job description and the D.O.T. standards for nursing (which both indicate that the strength demands are "medium") with the job standards that Saint Clare's told KCI to use for the FCE, the validity of which is challenged.

testing either at the time of hiring or as a condition of continued employment. The standards, which plaintiff claims are newly asserted, are being applied to her after she is returning to work from a workers' compensation leave. Finally, the employer may still prove its safety defense.

To the extent that the majority mentions absenteeism as an issue to be explored at trial, I must point out that absenteeism was not relied upon as a reason for plaintiff's termination and should not become a new reason to justify the adverse job action, particularly when the employee's absences were all due to legitimate job injuries for which the employer bears some responsibility under the social compact established under workers' compensation law. To use plaintiff's prior injuries as a rationale to terminate her, or to use them as a predictor of future inability to do the job, risks contravention of this state's public policy. And, as the Appellate Division majority underscored, probability, not mere possibility, is the test for reasonably predicting future safety issues.

### III.

In addition to the points discussed above, I am compelled to point out the following with respect to the future direction of this important area of law.

### A.

First, numerous courts have been reflecting on the development of discrimination litigation and on steps to simplify proof obligations in these cases rather than add to them. In particular, disability discrimination claims have provoked such attention, likely because they frequently involve an exclusive focus on the asserted justifications for disparate treatment rather than an inquiry into employer motivation.

In my view, this Court in *Jansen* took initial steps in directing how such claims should be handled straightforwardly. It would be my preference for this Court to continue down that path.

Courts across the country have struggled to articulate the most appropriate standard for disability discrimination claims, which differ from other types of discrimination claims in that they often involve an admission by the defendant that a plaintiff's disability motivated a discriminatory action. As the majority notes, we have looked to federal discrimination law for guidance interpreting our own analogous statutes. *Ante* at 21, 164 *A.*3d at 1041 (quoting *Grigoletti v. Ortho Pharm. Corp.*, 118 *N.J.* 89, 97, 570 *A.*2d 903 (1990)). The Court of Appeals for the Eighth Circuit has summarized the traditional difference between direct and indirect approaches to proving claims under the Americans with Disabilities Act (ADA), 42 *U.S.C.A.* §§ 12101 to 12213, as follows:

"[A]n employee may survive an employer's motion for summary judgment in one of two ways." The first is to produce "direct evidence of discrimination," which is evidence that shows "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." If the employee does not have direct evidence of discrimination, he or she may "show[ ] a genuine dispute for trial under the burden-shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 *U.S.* 792, 802–05, 93 *S.Ct.* 1817, 36 *L.Ed.*2d 668 (1973)."

[*Evance v. Trumann Health Servs., LLC*, 719 *F.*3d 673, 677 (8th Cir. 2013) (alterations in original) (internal citations omitted) (quoting *St. Martin v. City of St. Paul*, 680 *F.*3d 1027, 1033 (8th Cir. 2012)).]

Dissatisfaction with the strict categorization of evidence along those two lines exists, however. In the Seventh Circuit, a majority of judges have "join[ed] in the growing chorus of opinions ... that have expressed frustration with the confusing 'snarls and knots' of this ossified direct/indirect paradigm, and that have suggested a more straightforward analysis of whether a reasonable jury could infer prohibited discrimination." *Hitchcock v. Angel Corps, Inc.*, 718 *F.*3d 733, 737 (7th Cir. 2013) (quoting *Coleman v. Donahoe*, 667 *F.*3d 835, 863 (7th Cir. 2012) (Wood, J., concurring)); *see also Good v. Univ. of Chi. Med. Ctr.*, 673 *F.*3d 670, 680 (7th Cir. 2012) ("[D]irect and indirect methods for proving and analyzing employment discrimination cases ... have become too complex, too rigid, and too far removed from the statutory question of discriminatory causation.").

Such cases highlight that the relevant inquiry in a discrimination case is whether there is a triable issue of fact over the allegation that plaintiff has been subjected to invidious discrimination. Whether a plaintiff attempts to prove discrimination with circumstantial evidence, direct evidence, or some combination of both, the summary judgment analysis should be crafted to address the core issue of causation. In the disability context, a number of subsidiary issues can complicate evaluation of a plaintiff's claim. Those issues include, but are not limited to: (1) the nature and extent of the plaintiff's disability, including the medical evidence relied upon by an employer to support an employment decision; (2) whether the employer considered available reasonable accommodations before making its decision; and (3) whether a particular accommodation would be reasonable or would pose an undue burden for the employer.

In the federal context, courts assessing ADA claims have adopted various approaches to these issues but have not shoehorned all of them into the *McDonnell Douglas* framework, even in cases where circumstantial proofs were at issue. Several courts have even expressed skepticism that *McDonnell Douglas* is useful at all in a case where the employer concedes that an employee's disability motivated its employment decision. For example, in *Osborne v. Baxter Healthcare Corp.*, 798 *F.*3d 1260, 1266 n.6 (10th Cir. 2015), the court stated that the *McDonnell Douglas* framework was inapplicable because the defendant "indisputably rescinded [the plaintiff's] job offer because of her disability." The court relied on a prior holding that "[i]f the employer admits that the disability played a prominent part in the decision, or the plaintiff has other direct evidence of discrimination based on disability, the burden-shifting framework may be unnecessary and inappropriate." *Osborne, supra,* 798 *F.*3d at 1266 n.6 (quoting *Morgan v. Hilti, Inc.,* 108 *F.*3d 1319, 1323 n.3 (10th Cir. 1997)); *see also TWA v. Thurston,* 469 *U.S.* 111, 121–22, 105 *S.Ct.* 613, 621–22, 83 *L.Ed.*2d 523, 533 (1985) (observing in federal age discrimination context that "the *McDonnell Douglas* test is inap-

plicable where the plaintiff presents direct evidence of discrimination").

This case provided the Court with the opportunity to clarify and simplify the pretrial analysis of disability discrimination claims where no analysis of purported pretext or mixed motives is required. The majority does not seize that opportunity. I would step back and critically rethink our law. In keeping with this Court's prior jurisprudence and the progressive policies expressed in the LAD and its implementing regulations, the Court should always adopt a remedial approach to LAD claims and, in implementing the statute, should do so in a manner that will most effectively further the purpose of eradicating invidious discrimination. *See Nini v. Mercer Cty. Cmty. Coll.*, 202 *N.J.* 98, 108–09, 995 *A.2d* 1094 (2010) (explaining that "special rules of interpretation ... apply" to LAD).

### B.

Second, it is worth recalling that the elements of the *McDonnell Douglas* prima facie case exist as a tool to help plaintiffs raise an inference of disparate treatment by an employer. Here, the employer explicitly admits to treating an employee differently based on a disability or perceived disability. Accordingly, application of the *McDonnell Douglas* burden-shifting framework does not serve a useful purpose.

The *Jansen* paradigm focuses attention in disability discrimination cases on whether the employer has met its burden to justify terminating the employee. Although it referenced the *McDonnell Douglas* framework, the *Jansen* Court treated its analysis of the proofs in that matter as if it were dealing with a direct-evidence case. By focusing the parties directly on the area of dispute and the obligation of the employer to bring the adverse action within the sphere of justifiable disparate treatment on the basis of disability, the *Jansen* Court set forth a straightforward method of dealing with what was essentially direct evidence of disability discrimination. The *Jansen* Court differentiated between the em-

ployer who "seeks to establish the reasonableness of the otherwise discriminatory act" and one who "advances a non-discriminatory reason for the employee's discharge." 110 *N.J.* at 382, 541 *A.2d* 682. In the former setting, where no assertion of pretext is involved, the Court clearly kept the burden of persuasion on the employer to justify its reason for concluding that the employee could not reasonably do the job:

> If ... the employer defends by asserting that it reasonably concluded that the handicap prevented the employee from working, the burden of proof—as distinguished from the burden of production—shifts to the employer to prove that it reasonably concluded that the employee's handicap precluded performance of the job. When asserting the safety defense, the employer must establish with a reasonable degree of certainty that it reasonably arrived at the opinion that the employee's handicap presented a materially enhanced risk of substantial harm in the workplace.
>
> [*Id.* at 388, 541 A.2d 682.]

Disability discrimination in employment is different from other forms of unlawful discrimination because, unlike discrimination based on other proscribed characteristics like race or sex, discrimination based on disability is not prohibited if "the nature and extent of the disability reasonably precludes the performance of the particular employment." *N.J.S.A.* 10:5–4.1. This Court, like others, has recognized the difference implicated in disability discrimination claims. *See Zive, supra,* 182 *N.J.* at 447, 867 *A.2d* 1133 (noting "[t]he LAD prevents only *unlawful* discrimination against disabled individuals"). As discussed above, disability discrimination claims may involve burden-shifting related to the employer's justification for terminating an employee or its obligation to make a reasonable accommodation; however, the shifting of burdens on those issues should not be confused with *McDonnell Douglas* burden-shifting as part of a plaintiff's initial showing of disparate treatment.

Like all of the parties, including Saint Clare's, and the amici before the Court, I would recognize that this case involves direct evidence of discrimination rather than circumstantial evidence. By properly identifying the type of evidence at issue, the Court could have more plainly identified the remaining issues for trial: the

plaintiff should be expected to bear the burden of showing that she was the victim of disparate treatment based on disability or perceived disability, and the employer should bear the burden of proof to justify its action.

## C.

Whether this matter is called a direct evidence case or a circumstantial evidence case may not ultimately be of much consequence because the majority has correctly directed this matter to proceed to trial.

That said, to the extent that the majority asserts that this cannot be a direct evidence case because plaintiff does not present any evidence that Saint Clare's has exhibited hostility toward disabled persons as a class, I disagree. We should not perpetuate confusion over the role of hostility in distinguishing between direct and circumstantial evidence cases. That misunderstanding can be traced to a comment in *Bergen Commercial Bank v. Sisler*, 157 *N.J.* 188, 723 *A.*2d 944 (1999). Explaining the different methods of proof available, we observed in *Sisler* that to qualify as direct evidence, "[t]he evidence produced must, if true, demonstrate not only a hostility toward members of the employee's class, but also a direct causal connection between that hostility and the challenged employment decision." *Id.* at 208, 723 *A.*2d 944 (citing *Price Waterhouse v. Hopkins*, 490 *U.S.* 228, 277, 109 *S.Ct.* 1775, 1804, 104 *L.Ed.*2d 268, 305 (1989) (O'Connor, J., concurring)). To read the remark in *Sisler*—which was not necessary to the holding in that case—to mean that a showing of "hostility" toward an entire protected group is essential to every direct evidence claim creates an untenable requirement in order to establish unlawful discrimination by direct evidence.

The above-quoted statement in *Sisler*, stemming from Justice O'Connor's concurring opinion in *Price Waterhouse*, can fairly stand only for the proposition that stray remarks or other evidence that an employer disfavors a protected group, though probative, are not enough to provide direct evidence of a discrimi-

natory intent underlying any particular employment decision. *See Price Waterhouse, supra,* 490 *U.S.* at 277, 109 *S.Ct.* at 1804, 104 *L.Ed.*2d at 305 (O'Connor, J., concurring). The comment by Justice O'Connor was critical to her position in the "mixed-motive" context of *Price Waterhouse.* In a mixed-motive case, because an alternative, non-discriminatory motive is in play, a plaintiff alleging disparate treatment "must show by direct evidence that an illegitimate criterion was a substantial factor in the [adverse] decision" in order to shift the burden of production to the employer. *Id.* at 276, 109 *S.Ct.* at 1804, 104 *L.Ed.*2d at 304. *Sisler* cannot reasonably be understood as asserting that a hostility showing toward a class of protected individuals is necessary to all direct evidence employment discrimination claims.

Outside of the mixed-motive context, a blanket requirement that "hostility" be shown to allow reliance on direct evidence is misguided. That is particularly true in the area of disability discrimination, where we have long recognized that unconscious discrimination—based on generalities, stereotypes, and assumptions regarding the capabilities of individuals with disabilities—can be just as invidious as discrimination based on malice. *See Jansen, supra,* 110 *N.J.* at 378, 541 *A.*2d 682 ("We do not suggest that the employer ... is evil or even inconsiderate. The essence of discrimination ... is the formulation of opinions about others not on their individual merits, but on their membership in a class with assumed characteristics."). The LAD is animated by the public policy that individuals with disabilities must be afforded every reasonable opportunity to fully participate in society. *See N.J.S.A.* 10:5–4.1. It is an employer's burden to show that essential functions of a job cannot be performed by a disabled employee. *See N.J.S.A.* 10:5–29.1; *N.J.A.C.* 13:13–2.8.

To recognize that plaintiff's claim rests on direct evidence is not to say that there are no factual disputes left to be resolved. Here there are several important factual disputes. Plaintiff says that her employer has concocted the asserted "essential" lifting functions of the job by which she is being measured. She says she is not

disabled and can do the job. She says that the testing by KCI showed that she can perform the necessary lifting associated with her job. And, finally, although she never requested accommodation and was never offered any accommodation by her employer, the employer failed to explain why it could not "meet her needs," to the extent it perceived that she needed disability accommodation, even though there was no discussion with her or her doctor concerning those needs.

Jurisprudence on the ADA supports that disputes over what is an essential function of the job and whether an employee can perform the job notwithstanding a disability, or perceived disability, are for a jury to decide. They are not issues for the employer to decide unilaterally. One need only look to our own Circuit Court of Appeals to see that such factual issues compel a matter to proceed to trial. *See Deane v. Pocono Med. Ctr.*, 142 *F*.3d 138 (3d Cir. 1998) (en banc) (addressing similar claim brought under ADA by registered nurse terminated by her employer hospital due to alleged inability to meet physical lifting requirements). In *Deane*, the Third Circuit "decline[d] to apply conclusive effect to either the job description or [the hospital's] judgment as to whether heavy lifting is essential to [the plaintiff's] job." *Id.* at 148.[5]

To conclude, I agree that summary judgment was improperly granted to Saint Clare's. I concur in the majority's determination that this matter should be remanded for trial because there are numerous factual disputes to be resolved by the jury.

---

[5] The Third Circuit relied on Interpretive Guidance issued by the Equal Employment Opportunity Commission to clarify the definition of "essential function." *Deane, supra,* 142 *F*.3d at 148. The guidance states that although "inquiry into the essential functions is not intended to second guess an employer's business judgment with regard to production standards," the question of whether a given function is essential "is a factual determination that must be made on a case by case basis [and] all relevant evidence should be considered." 29 *C.F.R.* pt. 1630, app. § 1630.2(n).