**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3955-19

PAUL SERENA,

     Plaintiff-Appellant,

v.

W.J. DEUTSCH & SONS, LTD.,
d/b/a DEUTSCH FAMILY WINE &
SPIRITS, and EDWARD MELIA,

     Defendant-Respondents.

_____

Argued October 5, 2021 – Decided August 29, 2022

Before Judges Fisher, DeAlmeida and Smith.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-1968-18.

Edward W. Schroll argued the cause for appellant (Castronovo & McKinney, LLC, attorneys; Paul Castronovo and Edward W. Schroll, of counsel and on the briefs).

Heather R. Boshak argued the cause for respondents (Fox Rothschild LLP, attorneys; Heather R. Boshak, of counsel and on the brief; Allison L. Hollows, on the brief).

PER CURIAM

Plaintiff appeals the trial court's dismissal of his Conscientious Employee Protection Act[1] (CEPA) complaint on summary judgment. The trial court found that plaintiff failed to show that his actions constituted whistleblowing under N.J.S.A. 34:19-3(a). We reverse and remand for the reasons that follow.

I.

We discern the facts from the summary judgment record, viewing them in the light most favorable to plaintiff, who opposed summary judgment. See Richter v. Oakland Bd. of Educ., 246 N.J. 507, 515 (2021) (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)).

Defendant Deutsch was a supplier of wine and spirits in New Jersey. Deutsch was part of a multi-tier system of alcohol distribution where suppliers sold their products to distributors who in turn sold to retailers. As part of this system, Deutsch set sales goals for its distributors. Plaintiff was hired by Deutsch in 2003 as a New Jersey district manager, and he held this position until his termination in 2018. His responsibilities included working with Deutsch's distributors to generate sales and improve distribution of Deutsch's products.

---

[1] N.J.S.A. 34:19–1 to 34:19–8.

He would visit retailers to promote Deutsch's products in order to grow their market share.

A central aspect of plaintiff's job was helping his distributors sell Deutsch products. To accomplish this, plaintiff would assist the distributors with sales pitches to potential and existing retailers in order to generate more sales. When distributors' sales increased, their district managers received additional compensation.

Defendant Melia was a Deutsch regional manager, and he became plaintiff's supervisor in 2015. Melia's responsibilities included: managing the district managers and their distributors; managing product pricing and inventory; budgets; setting depletion and distribution goals; coaching and development of his staff; and monitoring his district managers' progress in meeting their sales targets, as established by Deutsch.

Deutsch provided incentives, including electronics and gift cards, to distributors to promote the sale of Deutsch's product to retailers. The incentive promotional programs were overseen by regional managers like Melia. It is illegal to incentivize directly to retailers, however, Deutsch could legally incentivize distributors. Regional managers, such as Melia, were responsible for planning, budgeting for, and administering the incentive programs.

3

Melia testified at his deposition that Deutsch and its distributors would agree to the sales goals and the corresponding incentives, like money or travel. He also testified that the most common incentive used by Deutsch was a cash incentive paid through the distributor's payroll. A goal would be agreed upon with a distributor, and when the distributor met the goal, the distributor's sales managers or sales representatives would earn the incentive. The distributor would invoice Deutsch afterwards. Melia testified at his deposition that although plaintiff could make recommendations concerning the incentive programs, plaintiff could not manage the incentive programs nor directly negotiate with the distributor. Those duties belonged to Melia.

As to retailers, only the distributor was permitted to establish and maintain incentive programs with them directly. "Dealer-loader" was a term Deutsch used to describe the rewards it used to persuade retailers to purchase its product.

The limit for dealer-loaders was $300 and the items were raffled by the retailers to the customers, donated to a charity, or returned to the distributor. These programs had to be registered with the State in a "program book." These program books were maintained by the distributor and the individual brand portfolio managers were responsible for ensuring that each dealer-loader was in the book.

4

The Business Gift Company (BGC) was a wholesale distributor of incentive merchandise and promotional products. BGC supplied merchandise to Deutsch. The owner of BGC, Robert Bixon, testified at his deposition that he would work with plaintiff and Melia on brand name incentive merchandise such as televisions, computers, printers, golf clubs, and logo products. The merchandise was used for Deutsch's dealer-loader programs. Bixon would invoice whoever placed the order – either Deutsch or the distributor partner. Melia was responsible for approving all of BGC's invoices, and Deutsch paid them. Plaintiff did not have the authority to pay BGC's invoices by Deutsch without approval from Melia.

Throughout plaintiff's employment, Deutsch maintained an employee handbook. The handbook directed employees to address any questions or concerns with their immediate supervisor, or human resources. The employee handbook also outlined a code of conduct, which included Deutsch's commitment to conducting business in compliance with applicable laws and regulations.

Deutsch's Director of Human Resources, Christina Delafield, certified that prior to this incident, employees had reported conduct they believed to be in violation of Deutsch's code of conduct. Delafield confirmed in her certification

A-3955-19

that investigations resulted from the complaints. On three occasions the investigations uncovered improper activity and the employees who engaged in the improper activity were terminated. The employees who reported the improper activity were not terminated and two of those employees were subsequently promoted.

In his complaint, plaintiff alleged that he repeatedly disclosed and objected to defendants' alleged illegal practices, specifically the use of inducements directly to retailers. At his deposition, plaintiff testified that when the dealer-loader program began, he would attend group meetings with distributors and supervisors to discuss ideas about what dealer-loader items to present, such as flat-screen television sets. As a result of these meetings, a brand portfolio manager would put ideas in a "brand book," and then plaintiff, a sales manager, or a sales representative with a distributor would present it at a sales pitch.

Plaintiff testified that he had concerns from the start of the dealer-loader program that it would become "corrupted, as items purchased from BGC that were supposed to go to distributors instead went to retailers." He stated that he would repeatedly voice his concerns at meetings.

A-3955-19

In 2010, plaintiff, his former supervisor, and another district manager collaborated to operate the dealer-loader program as a "parking lot program." This incentive program was conducted without the distributor, and Deutsch would provide incentives to retailers directly with no paper trail. Plaintiff recorded the incentive items in a computer not owned by Deutsch. He explained that the items were paid out of the local marketing budget, and the regional manager would submit the invoice to Deutsch's corporate office. The purchased items were delivered to his personal residence, although plaintiff testified he knew it was illegal to do so.

Plaintiff testified that prior to Melia becoming his supervisor, he complained to his former supervisor, former colleagues, other regional managers, as well as company vice presidents about this dealer-loader parking lot program. He voiced concerns that the program would be discovered and that he feared the State Alcoholic Beverage Commission (ABC) would learn of the matter. He stated that they all ignored his concerns. Plaintiff participated in the illegal dealer-loader programs, because he feared he would lose his job and wanted "to protect [his] lifestyle and [his] income." He began applying to other jobs, first in 2010 and again in 2013, but was unsuccessful.

A-3955-19

When Melia became plaintiff's supervisor, he told Melia about the illegal activities, stating, "[Melia], we're going to get arrested one day," or "[w]e're all going to wear orange jumpsuits." He testified at deposition that Melia knew about these illegal activities, as he had to approve the purchase of the items and the resultant invoices. He was concerned about how Melia submitted the invoices, because he believed an audit would raise questions about the items they were purchasing. Plaintiff never filed any complaint, either to Deutsch human resources, or with the ABC.

Melia testified at his deposition that he did nothing illegal in connection with the incentive programs. He said plaintiff did not say anything about the alleged illegal activities to him. Melia recalled one conversation with plaintiff about incentive items being delivered to his residence and asked plaintiff what he was doing with the items, to which plaintiff responded the items were sale incentive items that he was distributing to the distributor sale representatives. Aside from that one conversation, Melia did not ask plaintiff any further questions or take any further action.

In May 2017, Deutsch held a national sales conference. During the conference, Deutsch asked attendees to "raise their performance" in order to improve the company's position in the marketplace. While at the conference,

8

Steve Masket, Deutsch's general counsel, asked plaintiff about dealer-loader invoices from BGC. Prior to the conference, Masket had reviewed the invoices and had noticed many electronic items being delivered to plaintiff's residence. Masket questioned plaintiff about why he was storing BGC items at home. Plaintiff explained the items were being used for distributor incentives, and that they were being delivered to his home to ensure the correct items had been purchased and were undamaged. After this exchange, plaintiff immediately went to Melia and reported to him that Masket asked him about the invoices. Plaintiff suggested that Melia immediately report the conversation to Steve DiCarlo, a division vice-president. Melia did not do so.

Shortly after the conference, DiCarlo held a conference call that included plaintiff, Melia, Masket, and Robert Thomas, the New Jersey district manager. Plaintiff and Melia both testified that DiCarlo spoke to them about their handling of the dealer-loader programs. Plaintiff said that he expressed concerns about the dealer-loader program during this conversation, however, during his deposition he could not recall what specific concerns he voiced. On the conference call, DiCarlo informed the group they needed to find a better way to manage the programs. Soon after the call, Deutsch eliminated the BGC dealer-loader gift program.

A-3955-19

Plaintiff stated that, after the May 2017 conference, Deutsch decided that it was no longer going to use BGC and switched to gift cards for retailer incentives, instead of physical items, such as electronics. Deutsch's senior vice president, Jeffrey Corbett, testified at deposition that Deutsch stopped using BGC because using a third party was not in line with "best practices."

Plaintiff testified that in October 2017 he argued with Melia about the incentive program involving gift cards that were passed along in lieu of the electronic dealer-loaders, contending to Melia that this activity was "highly visible." Plaintiff believed the gift card program was illegal because it was not filed with the State, nor was it in any distributor's program book. He stated that when Melia became his supervisor in 2015, he complained to Melia that he did not like going "to Staples and buy[ing] so many of them." Plaintiff feared "an audit [or] . . . someone above [Melia] in the accounting department . . . inquiring . . . why I am going to Staples, OfficeMax, and buying so many of these gift cards." Plaintiff testified that he repeatedly complained to Melia, who just ignored the complaints saying, "[t]hat is the way we do things." Plaintiff stated he was not comfortable engaging in such activities, but that he did it anyway because he did not want to be viewed as "insubordinate."

A-3955-19

Melia testified that plaintiff's performance was "inconsistent" from the time he began working with plaintiff. As a result, Melia and DiCarlo put plaintiff on a "coaching plan" in May 2017. Specifically, Melia found that plaintiff was not:

> holding his sales team accountable, he wasn't writing smart goals for his team to improve performance in their territories, he wanted in on our portfolio, he was not organized on his calendar, he didn't manage his time well, his communication was inconsistent. There would be times when he wouldn't respond for hours or even a day. It needed to be very structured. And that's how we arrived at that.

Plaintiff testified that after the 2017 conference call with DiCarlo about the incentive issue, Melia retaliated by placing him, for the first time in fourteen years, on a performance improvement plan (PIP). Plaintiff admitted that throughout his employment he was criticized about his time management and communication skills, and he was told he needed to perform "more and deliver[] more." He insisted that the criticism never led to corrective action against him. Plaintiff argued that his performance had been good, pointing to his annual raises, his track record of meeting "most" sales goals, and the "outstanding" relationships he developed with his accounts.

Plaintiff's 2017 employee evaluation was completed that summer and he scored a 1.8, making him the lowest ranked employee out of thirty-three in one

11

of Deutsch's sales territories. Next, plaintiff had three meetings with another Deutsch vice-president, John Moorehead, in December 2017 as well as March and April 2018. As part of the meetings, Moorhead accompanied plaintiff on account visits. Moorehead testified that the first and third meetings went poorly, finding plaintiff "ill-prepared."

Melia also attended the March sales trip, and he testified that plaintiff "met expectations" in terms of job performance. Plaintiff himself graded his April performance as a "C+," below his own expectations.

Shortly after plaintiff's April sales trip with Moorehead, Deutsch terminated him. Melia recommended termination, which was approved by the company president, among others. According to Melia, Deutsch terminated plaintiff because his performance was too inconsistent.

On June 13, 2018, plaintiff filed a complaint asserting one count of retaliation under CEPA. Defendants filed an answer and counterclaim alleging conversion and misappropriation, specifically that plaintiff wrongfully retained defendants' property after his termination.

On May 8, 2020, defendants filed a motion for summary judgment. The court granted the motion and dismissed the complaint. The court issued a written statement of reasons, finding that while plaintiff reasonably believed

Deutsch was violating a law or clear mandate of public policy, his actions did not constitute "whistle-blowing activity" under N.J.S.A. 34:19-3(a). The court found plaintiff's termination to be an adverse employment action under the statute, but concluded the termination was not actionable without a finding of whistleblowing activity.

Plaintiff appeals, arguing that the record shows genuine issues of material fact as to prongs two and four of CEPA, warranting denial of summary judgment.[2]

II.

We review a grant of summary judgment de novo, using "the same standard that governs the motion judge's" decision. RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018). Summary judgment will "be granted 'if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016) (quoting R. 4:46-2(c)). "An issue of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted

---

[2] On June 29, 2020, the parties filed a stipulation of dismissal without prejudice of Deutsch's counterclaim against plaintiff.

A-3955-19

by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Grande v. St. Clare's Health Sys., 230 N.J. 1, 24 (2017) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)).  In our review, we owe "no special deference" to the trial court's legal analysis.  RSI Bank, 234 N.J. at 472.

The Legislature designed CEPA to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct."  Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994); see also Allen v. Cape May Cnty., 246 N.J. 275, 289 (2021).  CEPA's purpose is "to protect whistleblowers from retaliation by employers . . . ."  Lippman v. Ethicon, Inc., 222 N.J. 362, 378 (2015).  Consistent with that purpose, CEPA "is considered remedial legislation entitled to liberal construction."  Ibid.

To establish a prima facie claim under CEPA, a plaintiff must demonstrate:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;
>
> (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c);
>
> (3) an adverse employment action was taken against him or her; and

(4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

[Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003).]

When a plaintiff establishes a prima facie claim under CEPA, the burden of persuasion shifts to the defendant employer "to rebut the presumption of discrimination by articulating some legitimate nondiscriminatory reason for the adverse employment action." Allen, 246 N.J. at 290-91 (quoting Kolb v. Burns, 320 N.J. Super. 467, 478 (App. Div. 1999)). If the employer meets that burden, the plaintiff then must prove the employer's asserted legitimate reasons were pretextual and not the real reason for the employer's discriminatory acts. Id. at 291.

## III.

Because the motion court grounded its order granting summary judgment in its finding that the plaintiff did not engage in protected whistleblowing activity, we turn to prong two of CEPA and examine the record in that context. N.J.S.A. 34:19-3(a) states:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, in the case of an employee who is a licensed or certified health care professional, reasonably believes constitutes improper quality of patient care; or

(2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity . . . .

Plaintiff testified that he informed his supervisor, Melia, that he was "concerned" about the illegal sales incentives and rewards programs they were working on together. He testified that his concern related to: being questioned about the unusually large number of cases he kept in the warehouse to service the illegal programs; being stopped and pulled over by law enforcement with "fifteen, almost twenty cases of wine and spirits" in his vehicle; being required to purchase an "enormous amount of gift cards" to hand out to retailers; and being "discovered, arrested, losing [his] job, and going to jail."

16

Plaintiff further testified:

> I complained to [Melia] numerous times in the two years plus that we worked together. An exact number, I do not have. I typically complained to him at a highest level when I had something on my expense report that was of an illegal nature that was not a legal expense, that was not something that I should be doing. I would explain to him that he needed to approve it. I told him about why. And I would say, 'It is illegal. I don't like doing this, but . . .' he would approve it.

CEPA does not require any magic words in communicating an employee's reasonable belief of illegal activity. Beasley v. Passaic Cnty., 377 N.J. Super. 585, 605-06 (App. Div. 2005). "The object of CEPA is not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonably believe to be unlawful . . . ." Mehlman v. Mobil Oil Corp., 153 N.J. 163, 193-94 (1998).

We do not find plaintiff's statements to Melia "mere disagreements." We are required to take "all legitimate inferences . . . favoring the non-moving party. . . ." Grande, 230 N.J. at 24. Because we owe no special deference to the trial court's legal analysis, RSI Bank, 234 N.J. at 472, we find the issue of whether plaintiff engaged in whistleblower activity "require[s] submission of the issue to the trier of fact." Grande, 230 N.J. at 24. It is not the role of the motion court to weigh

17

competing testimony. Rather it had to give plaintiff "all reasonable inferences" on the whistleblower issue and committed reversible error by not doing so.

Having found that a genuine issue of material fact exists on the whistleblower question, we briefly turn to causation under CEPA. The facts, taken as true, show plaintiff complained repeatedly about the illegal rewards and incentive programs to Melia, his direct supervisor, beginning in 2015. After the May 2017 companywide meeting, plaintiff participated in a conference call about the illegal programs with Melia included on the call. After that call, Melia began to treat plaintiff poorly, and placed plaintiff on a PIP for the first time in his fourteen-year career. At Melia's recommendation, Deutsch terminated plaintiff less than one year after the conference call. We conclude that the record shows a sufficient nexus between plaintiff's whistleblower activity and his termination to warrant denial of summary judgment on the causation issue.

Defendant raises a final issue that warrants brief discussion. While plaintiff admitted participation in the illegal incentive schemes during his career at Deutsch, such participation is not a per se bar to recovery in a CEPA claim. See Donofry v. Autotote Sys., Inc., 350 N.J. Super. 276, 288 (App. Div. 2001). To the extent we have not addressed Deutsch's other arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

19                                                                A-3955-19